[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 207 
Appellant was convicted of murder and the jury fixed his punishment at death. He was represented by court-appointed counsel and at arraignment pleaded not guilty. He and his attorney signed a written waiver for a special venire and agreed to strike a jury from the regular panel drawn for the week appellant's case was set for trial.
Appellant was tried on count one of the indictment which, omitting the formal parts, reads as follows:
 "The Grand Jury of said County charge that, before the finding of this Indictment Herbert Lee Richardson, whose name is to the Grand Jury otherwise unknown, did unlawfully and with malice aforethought, willfully set off or explode dynamite or other explosives in, under, or dangerously near an inhabited dwelling house in which a human being was lodged, to-wit: Rena Mae Callins, and a person, Rena Mae Callins was intentionally killed by Herbert Lee Richardson because of said explosion, against the peace and dignity of the State of Alabama."
The State filed a motion to dismiss counts two and three of the indictment and this motion was granted.
Appellant filed a motion to suppress the evidence; a motion to quash the indictment; a motion to suppress certain photographs, and a motion to produce certain documents and other information. All of these motions were heard and denied by the trial court on January 20, 1978, with the exception of the motion to produce which was granted.
In connection with the motion to suppress the photographs appellant filed the following stipulation:
 "Comes now the defendant in the above styled cause and does hereby stipulate that the said Rena Mae Callins was killed on the 16th day of August, 1977, as the proximate result of an explosive device and that said explosive device caused severe and fatal damage to the said Rena Mae Callins' body."
Accompanying the above stipulation was the following motion:
 "Comes now the defendant, Herbert Lee Richardson, having heretofore stipulated that Rena Mae Callins was killed on the 16th day of August, 1977, as a proximate result of the explosion of an explosive device and that said explosive device caused severe and fatal damage to the *Page 208 
said Rena Mae Callins' body, and hereby moves to suppress the introduction of certain photographs in the possession of the Honorable Tom Sorrells, District Attorney of Houston County, Alabama, said photographs depicting the body of Rena Mae Callins after the explosion of said explosive device and as grounds therefor says as follows:
 "1. The said photographs are irrelevant and immaterial to the issues in the trial of this cause.
 "2. That the introduction of said photographs would inflame the minds of the jurors against the defendant.
 "3. That the introduction of said photographs would be prejudicial to the defendant and deny him the right to a fair and impartial trial.
 "4. That the introduction of said photographs in the light of the stipulation on file herein would only inflame the minds of the jury and be prejudicial to your defendant."
The photographs were taken at the scene of the explosion by Officer Larry Lynn of the Dothan Police Department. They depict the body of Rena Mae Callins from several different angles, revealing the massive and extensive damage caused by the explosive device. One photograph taken of the deceased's head from the direction of the blast was kept from the jury by the trial court. Three photographs of the victim were admitted into evidence, including one close-up of the victim's upper torso. Two other photographs show the victim's brain lying almost intact at her feet.
It is settled law in this State that gruesome, even ghastly and unsightly, photographs properly identified and authenticated are admissible if they tend to shed light on, strengthen or illustrate the truth of other testimony. Hurst v.State, 54 Ala. App. 254, 307 So.2d 62; Lewis v. State, Ala.Cr.App., 339 So.2d 1035.
Such photographs are admissible for the purpose of shedding light on the character and location of the wounds on the body of the victim. Cole v. State, Ala.Cr.App., 337 So.2d 40;Balentine v. State, Ala.Cr.App., 339 So.2d 1063.
In Lewis v. State, supra, this Court held in an opinion by Judge Bookout:
 "In Alabama, where the jury sets the punishment in homicide cases, we have been extremely liberal in allowing photographs portraying the mutilated bodies of victims. This for the purpose inter alia of shedding light upon the viciousness of the crime, the depravity of the killer, the ferocity of the attack, and like circumstances which the jury may take into consideration in fixing punishment. We have not allowed a depraved and vicious killer to mitigate his horrible or animalistic acts by merely stipulating that the victim is dead and the cause of death. . . ."
On January 11, 1978, appellant filed the following motion:
 ". . . Comes now the defendant in the above styled cause and moves to suppress as evidence to be used in the trial in the above styled cause on January 23, 1978, all items seized under the authority of certain searches of the defendant's vehicle and home, said searches having occurred on August 16, 1977, a copy of said search warrants and returns being attached hereto and marked Exhibit `A' and `B' respectively, and as grounds therefor the defendant says as follows:
1.
 "Said search warrants were issued in violation of Title 15, Chapter 5, Section [Sections] 2 and 3 of the Code of Alabama, 1975.
2.
 "Said search warrants were issued in violation of Section 5, Constitution of Alabama of 1901 and Amendment IV, Constitution of the United States.
3.
 "For the said search warrants were issued without probable cause. *Page 209 
4.
 "For the affidavit in support of said search warrants is legally insufficient to justify the issuance of the subject search warrants."
This motion was heard by the trial court on January 20, 1978. The evidence adduced at that time is fully set out below.
Jimmy Hand testified that he was employed by the Sheriff's Department in Geneva, Alabama. On August 16, 1977, Hand appeared before Judge Black, the Geneva County District Judge, for the purpose of obtaining a search warrant in the case at bar.
The following are the affidavits, filed by Hand, and the warrant, issued thereon:
"State of Alabama In the District Court Geneva County of Geneva County, Alabama
 "Before me, George A. Black, Judge of the District Court of Geneva County, Alabama, personally appeared Jimmy Hand, Deputy Sheriff. The undersigned being duly sworn deposes and says: That he has reason to believe and does believe, that on the premises known as Rosetta Richardson residence being located at 214 North 6th Ave., Hartford, Alabama in Geneva County, Alabama. A residence occupied by Rosetta Richardson whose name is otherwise unknown, there is now being concealed illegal explosives devices in the County of Geneva namely:
 "Illegal Explosives to-wit: Explosive devices of any illegal nature contrary to law.
 "I have received information from a reliable person, that a subject living or who has lived at the above described address has been involved in a felony where explosive devices have been used: to-wit: explosives devices have been used within the last 24 hours, and I have reason to believe that explosive device or explosive device paraphernalia is present at this residence at this time.
 "I therefore request a search warrant to search these premises.
 /s/ Jimmy Hand
Jimmy Hand, Deputy Sheriff
 "Sworn to before me, and subscribed in my presence, the 16th day of August, 1977.
/s/ George A. Black
Judge, District Court
* * * * * *
"Affidavit
 "Before me the undersigned authority, personally appeared Jimmy Hand Deputy Sheriff of Geneva County Sheriff Dept., who is known to me and after being first duly sworn, deposes and states under oath as follows:
 "1. That Sgt. Harold Locke of the Dothan Police Department has information that Rena Mae Callins was killed on August 16, 1977 and that her death was result of a pipe bomb.
 "2. Officer Locke stated that he was personally told by victim's mother Doris Weems, that Hubert Richardson had threatened her life.
 "3. Sgt. Locke further stated that Randall Kallines (sic) told him he saw Hubert Richardson leave the scene of the crime at 129 East North Street at approximately 6 a.m. on August 16, 1977, immediately after leaving Randall Kallines (sic) said he saw bomb on front porch.
 "4. Sgt. Locke, stated that he personally saw pipe that was identical pipe to that was used in the bomb, also pipe of this description was seen in the truck that Richardson used on his job.
 "5. Sgt. Locke stated that he saw pipe like that what was used in the bomb in the back yard of Rosetta Richardson's residence in Hartford as described in search warrant.
 "6. Houston County Police Officers informed Jimmy Hand that batteries and wire similar to that used in bombs was found in Hubert Richardson's car.
 /s/ Jimmy Hand
Jimmy Hand
 "Sworn to before me and subscribed in my presence August 16, 1977.
 /s/ George A. Black
District Judge"
 "State of Alabama Geneva County *Page 210 
"TO THE SHERIFF OR ANY CONSTABLE OF SAID COUNTY:
 "Proof by affidavit having this day been made before me by Jimmy Hand that he had probable cause to believe that Rosetta Richardson whose name is otherwise unknown to affiant, has in possession explosive device or explosive paraphernalia as described above in the affidavit, at the premises of Rosetta Richardson being located 214 North 6th Ave., Hartford, Alabama in Geneva County, Alabama.
 "You are therefore commanded, in the daytime only to make immediate search of the person of Rosetta Richardson and all other persons present and all automobiles and outhouses and in and upon the above described premises for the following explosive devices or explosive paraphernalia and if you find the same or any part thereof, to bring it forthwith before me, at my office at the Courthouse. "Dated this the 16th day of August, 1977.
 /s/ George A. Black
Judge, District Court"
On the afternoon of August 16, 1977, Hand testified, he and his partner were notified through radio dispatch from the Hartford Police Department to stand by for some "traffic." Shortly thereafter, Hand received a telephone call from Hartford. At this time he spoke briefly to Sergeant Locke of the Dothan Police Department and at length to Houston County District Attorney Tom Sorrells. Sorrells gave Hand the information contained in the affidavit, telling him that this information was gathered by Officer Locke. Locke was personally known to Hand.
In addition to the information contained in the affidavit for the warrant, Hand also, under oath, told Judge Black that he received this information from Sorrells who was relaying it from Officer Locke. Hand told Judge Black that the police officers knew that appellant lived with Rosetta Richardson at the residence listed in the affidavit. A tag issued to appellant's car was registered to that address.
After obtaining the warrant, Hand participated in a search of Rosetta Richardson's home. Also present were Officer Locke and two Alcohol, Tobacco and Firearms Agents, a unit of the United States Treasury Department. As items were confiscated by the officers, they were marked, stored in containers and given to Officer Locke. A list of items seized at the residence was typed up and attached to the warrant, which was then shown to Judge Black two days later. That list is set out below:
 "Items Seized in Search of 614 6th Avenue, Hartford, Alabama
Residence of Herbert Lee Richardson.
One black and red electric wire.
One rubber glove with gunpowder residue.
Seven small pieces of green, white, orange wire.
Small pieces of electrical tape.
 One sample of gunpowder found on dresser in master bedroom.
Two pieces of cardboard.
One pair of scissors.
One screwdriver.
One piece of cardboard (irregular cut).
 Wirecutters with green handle with gunpowder residue.
Micro (mercury) switches.
 One can (half-full) of Brand AA ball powder, one pound capacity.
One check stub, name of Herbert Lee Richardson.
 One book entitled, `1977 Model Rocketry Catalog,' No. 771.
 One book entitled, `Explosives and Bomb Disposal Guide' 4th printing, stamped `Library Copy' with a Houston Memorial Library Card, George S. Houston Memorial Library, Dothan, Date of which to be returned, August 19, 1977. Also stamped property of George S. Houston Memorial Library."
Randy Callins testified that on August 16, 1977 he lived at 129 East North Street in Dothan, Alabama, with his mother Marjorie Callins and his sister Rena Mae Callins. On that morning, after the explosion, he talked to the investigating officers. He told the officers that before the blast he *Page 211 
had seen a plastic bag on a chair on the front porch but he did not know what was in the plastic bag. He further testified that he saw appellant drive by the house between six and seven o'clock that morning before the bomb exploded. He gave the officers a description of the automobile driven by appellant. He stated that appellant stopped at a record shop near this address. Appellant got out of his car and looked back at the house for a while and then left.
Sergeant Harold Locke testified that he was assigned to the Criminal Investigation Division of the Dothan Police Department. On August 16, 1977, he went to the home of Rosetta Richardson in Hartford, Alabama, at approximately 4:30 p.m. He was accompanied by the District Attorney, Hartford Police Chief Smith, Sergeant Larry Lynn and two special agents with the Alcohol, Tobacco and Firearms Unit of the Treasury Department. These officers ascertained that no one was at home. They knocked on the front door but got no response. They looked around the outside premises. Locke stated that as they drove to the house he observed some galvanized pipe in the yard which was clearly visible from the street. He said this pipe was very similar to the pipe fragments he had examined at the scene of the blast at 129 East North Street that morning.
Prior to the search of Rosetta Richardson's home, appellant's car had been examined by an Explosives Ordnance Detail from Fort Rucker upon request of L.E. Stokes, Commander of the Criminal Investigation Division of the Dothan Police Department. Subsequent to this examination by military personnel, Stokes had obtained a search warrant and searched this vehicle.
L.E. Stokes testified that he investigated a bomb explosion on the morning of August 16, 1977, at approximately 8:30 a.m. The warrant to search appellant's car was supported by the following affidavit:
 ". . . 1. Before me Billy J. Sheffield a Judge of the Houston County District Court, Houston County, Alabama, 2. personally appeared L.E. Stokes 3. who, being duly sworn, deposes and says that Herbert Lee Richardson, with malice aforethought and with premeditation, killed Rena Mae Callins and did this by exploding a bomb, and that batteries, wires, switches and other paraphernalia used in the making of a bomb are believed to be in the automobile, to-wit: a 1970 Pontiac Firebird, brown over brown in color, Alabama Tag #CMX-085, 1977, the property of Herbert Lee Richardson. Affiant's probable cause for believing the said facts are:
 "(1) Witnesses observed the 1970 Pontiac automobile described above passing by the house where Rena Mae Callins was killed, to-wit: 129 East North Street, Dothan, Houston County, Alabama, a short time prior to the explosion.
 "(2) The above described automobile was described by witnesses at the scene of the explosion as being known to them to be the property of Herbert Lee Richardson.
 "(3) A search of the area around 129 East North Street where Rena Mae Callins was killed by a bomb at about 8:30 a.m. on August 16, 1977, revealed fragments of a battery or batteries.
 "(4) Herbert Lee Richardson was known to have been in the automobile when it was seen at 129 East North Street and a description of him and the automobile was given out over the City of Dothan Police Department radio network and the car was located at the intersection of U.S. Highway 84 West and the Ross Clark Circle at Tom's Drive Inn Restaurant abandoned and locked up.
 "(5) The car was found within a short period of time after the explosion and the City of Dothan Police who arrived at the scene called the bomb disposal squad of the U.S. Army at Ft. Rucker who opened the car and took out all of the items in the car while the car was parked at the above location.
 "(6) At this time, affiant saw a 9 volt battery consistent with the pieces of battery found at the scene of the explosion. Wires, two small switches that could have been used in the making of a battery and *Page 212 
the size and shape of a 9 volt battery was consistent with the fragments found at the scene of a bombing. The car was found at 11 a.m. on August 16, 1977; examined by the bomb squad at 1 o'clock.
 "(7) Randy Callins saw the above described car just prior to the explosion. Randy Callins shortly before the bomb went off saw the above described car and Herbert Lee Richardson driving the car leave the area of 129 East North Street. Witnesses told affiant that the package was not there before the car drove by.
 "(8) The residence at 129 East North Street, Dothan, Alabama was the residence on August 16, 1977 of a daughter of Emma Wymes. Herbert Lee Richardson had in the early part of 1977 dated a daughter of Emma Wymes and Herbert Lee Richardson wrote a message and mailed it through the U.S. mail and Emma Wymes picked it up at the post office on August 15, 1977 and in this message, Herbert Lee Richardson said in substance that the daughter of Emma Wymes, that he had been dating, would have an unhappy birthday on August 16, 1977. August 16, 1977 is in fact the birthday of that daughter. Mrs. Remus Callins was in fact at the residence at 129 East North Street when the bomb exploded and she was in the house when he rode by the house before the bomb went off.
 "Herbert Lee Richardson had within the last past 6 weeks threatened to kill Mrs. Remus Callins and had threatened to kill Emma Wymes.
 "(9) Affiant was told by witnesses at the scene of the explosion that Herbert Lee Richardson was mad at Rena Mae Callins' mother because she had been refusing to let Herbert Lee Richardson see her sister whom he had formerly dated.
 "I am the Lt. in charge of the Criminal Investigation Division of the City of Dothan Police Department and I am in charge of the above described investigation.
 "Sworn to and subscribed before me this the 16th day of August 1977
/s/ L.E. Stokes
 /s/ Billy J. Sheffield
Judge, Houston County District Court, Houston County, Alabama."
Stokes testified that appellant's car was located at 11:00 a.m. parked at Tom's Restaurant. When the EOD team arrived, Stokes stated, the members of the team checked the car "from one end to the other, inside and out." Following the inspection, Stokes was informed by an officer of the detail that the car was safe to approach. Stokes and Tommy Mullis, another police officer, placed all the items removed by the EOD team back into the car; Mullis then driving the car back to the police station. Stokes admitted that the affidavit for the subsequent warrant was based in part on what he had observed during the course of the examination of the car by the EOD team.
When the warrant was obtained from Judge Sheffield, a search was carried out and numerous items were seized. The return is set out below:
"two 30-06 rounds (markings 5 3 S L)
1 partial roll of electrical tape
1 partial roll of Red Cross adhesive tape
1 heavy duty long Fox glo-plug
1 DD214 in name of Richardson, Herbert Lee
8 AG-1B flashbulbs by GE
1 Eveready 9 volt transistor battery
2 small wadded piece of electrical tape
1 small Craftsman screwdriver
1 pair of eyebrow tweezers (no namebrand)
 1 pointed steel rod 3/4" in diameter approx. 2 1/2 in. long
1 roll of masking tape (coated with gauze)
1 rubber spacer (S.N. 5149-68)
1 partial roll of electrical tape
1 strip of black electrical tape (approx. 4" long)
1 Murray Corp. hose clamp
 3 blue rubber cylinder type insulators taped together with electrical tape
2 metal washers *Page 213 
(a) appx. 3/8" shock washer
(b) appx. 1/2" flat metal washer
 1 strip of 3 strand electrical wire assorted papers"
Stokes testified that he interviewed Randy Callins at the blast site. Randy told him that he had not seen the package on the porch before he saw appellant ride by the house. Several of the dead child's relatives were interviewed at the scene. Mrs. Remus Callins, the mother of the deceased, told Stokes that appellant had threatened her because she would not allow him to see her sister. While at the scene, Stokes found what appeared to be the base of a nine-volt battery.
On cross-examination, Stokes testified that Tom's Restaurant was a public place and that patrons were present at the time appellant's car was found. Based on the information Stokes gathered at the scene of the blast, and the belief that the public should be protected, Stokes determined that it was necessary to summon the EOD team from Fort Rucker. Stokes testified that, although he had not included it in the affidavit or told the issuing magistrate, Doris Wymes told him that appellant had talked to her about making bombs. Ms. Wymes had seen pipe in appellant's yard before. In addition, appellant had told Doris Wymes that he killed a woman in New Jersey and had to leave that state.
Appellant first contends that the police were not justified in carrying out a warrantless search of his vehicle. As appellant correctly notes, there are six exceptions to the requirement that a warrant be obtained before a search is executed. They are: (1) plain view, (2) consent, (3) incident to a lawful arrest, (4) hot pursuit or emergency situations, (5) exigent circumstances coupled with probable cause, and (6) stop and frisk situations. Baker v. State Ala.Cr.App.,340 So.2d 854.
Appellant points out that the search was not incident to a lawful arrest, not plain view, that consent was not at issue, and that a stop and frisk was not involved. He further contends that no probable cause or exigent circumstances existed, and that no emergency situation was present. Here appellant is mistaken.
The facts in the case at bar are strikingly similar to those of Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523,37 L.Ed.2d 706. There the respondent Dombrowski was arrested by police for drunken driving after being involved in a one car accident; he told the officers he was a Chicago police officer. On the next day, believing that a Chicago police officer must carry his service revolver at all times, a local police officer conducted a warrantless search of Dombrowski's car, since he had not found the revolver on Dombrowski's person. In the locked trunk of the car, the investigating officer found several items, some bloodied. Subsequently this evidence, coupled with other information obtained from Dombrowski, led police to a bloodstained body on Dombrowski's brother's farm. The United States Supreme Court held that the search of the vehicle's trunk was not unreasonable since it was necessary to keep the weapon from falling into improper hands, and protect the public.
Secondly, it should be noted that the mobility of the vehicle coupled with the knowledge obtained by Stokes at the blast scene warranted the course of action taken. The constitutional difference between the searches of houses and cars is well established. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975,26 L.Ed.2d 419.
Next appellant attacks the sufficiency of the affidavit for the warrant for the search of appellant's house, claiming that it was "false." Appellant bases this contention on two factors.
First, appellant urges that Deputy Hand swore that Sergeant Locke had informed him of all the information in the affidavit; when, in fact, District Attorney Tom Sorrells had relayed the information for Locke. Then appellant states that this was "hearsay piled on top of hearsay." Though hearsay will support a search warrant, appellant writes in brief, the affiant must state evidence other than hearsay to justify a conclusion that the hearsay is reliable. Clenney *Page 214 v. State, 281 Ala. 9, 198 So.2d 293. As other authority for his argument, appellant cites Sopcjak v. State, 42 Ala. App. 608,173 So.2d 403. There the affidavit stated that the affiant had personally appeared before the magistrate when in fact he had not; this Court reversed and remanded the case.
It appears in the record of the motion to suppress the evidence that Deputy Hand talked to Locke and Sorrells in the presence of the judge who issued the warrant. From the record:
 "Q. And did you tell him you were talking to the Police Department, to the District Attorney?
"A. Yes, sir.
 "Q. And he was telling you what Sergeant Locke was telling him?
"A. Yes, sir.
 "Q. And did you swear to everything you told the Judge then after this conversation on the phone?
"A. Yes, sir."
In United States v. Thomas, 489 F.2d 664, the Fifth Circuit Court of Appeals adopted the standards to be used in evaluating affidavits which are alleged to contain misrepresentations. Evidence should be suppressed when either of the following occurs:
 ". . . (1) an intentional misstatement by an affiant-agent, whether material or immaterial to showing probable cause; or (2) a negligent or unreasonable assertion in an affidavit, if material to showing probable cause, but not where (3) the mistake is innocent, even if material to probable cause."
It is not apparent from the record that Deputy Hand has intentionally or negligently misrepresented any of the facts underlying the search warrant in question. See also, Smith v.State, Ala.Cr.App., 351 So.2d 668, cert. denied, Ala.,351 So.2d 675.
As to appellant's attack on the affidavit on the basis ofClenney, supra, that, too, must fail. At the initial point of analysis, it should be noted that law enforcement officers participating in a common investigation are reliable informants under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509,12 L.Ed.2d 723; Brooks v. United States, 416 F.2d 1044, Fifth Circuit Court of Appeals; Davis v. State, Ala.Cr.App., 333 So.2d 168. The question of the reliability of the information supplied by members of the victim's family to Locke remains.
In United States v. Bell, 457 F.2d 1231, the Fifth Circuit Court of Appeals addressed this issue. We find the following language.
 ". . . It is now a well-settled and familiar concept, as enunciated by Aguilar and Spinelli, that supporting affidavits in an application for a search warrant must attest to the credibility of an informant and the reliability of his information. See also United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). We have discovered no case that extends this requirement to the identified bystander or victim-eyewitness to a crime, and we now hold that no such requirement need be met. The rationale behind requiring a showing of credibility and reliability is to prevent searches based upon an unknown informant's tip that may not reflect anything more than idle rumor or irresponsible conjecture. Thus, without the establishment of the probability of reliability, a `neutral and detached magistrate' could not adequately assess the probative value of the tip in exercising his judgment as to the existence of probable cause. Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it. A `neutral and detached magistrate' could adequately assess the probative value of an eyewitness's information because, if it is reasonable and accepted as true, the *Page 215 
magistrate must believe that it is based upon firsthand knowledge. Thus we conclude that Aguilar and Spinelli requirements are limited to the informant situation only."
Thus the affidavit for the warrant for the search of appellant's home was sufficient. See also United States v.Romano, 482 F.2d 1183 (5th Cir.); and Alexander v. State, Ala.Cr.App., 337 So.2d 99.
On the trial in chief John Bruner testified that on August 16, 1977 he was employed by the Dothan Police Department. On that morning, Bruner went to 129 East North Street, where he saw a body lying on the doorstep. Upon observing this, Bruner called his supervisor and began to "secure" the scene. The body was that of a female, portions of the head and face were "missing." While Bruner was on the scene, Sergeant Larry Lynn arrived. Neither of these two men disturbed the body; however, Bruner covered it with a bedspread, taken from a couch in the house.
Randy Callins testified that he was ten years old, the brother of Rena Mae Callins, and that he lived at 129 North East Street on August 16, 1977. On that morning, Randy got up early, before anyone else did, and "called the time" on the phone in Rena Mae's room, on the front of the house. Randy looked out the window and saw appellant's car, a brown and white Firebird, go by the house and stop at the record shop. After stopping there for a short while, appellant continued down the road in the same direction that he passed the house. Randy saw a plastic bag on the porch then. About a month prior to the date in question, appellant had called Randy a "Black son-of-a-bitch."
Larry Lynn testified that he was employed by the Dothan Police Department. On August 16, 1977, Lynn proceeded to 129 East North Street in Dothan, arriving at 9:15 a.m. Patrolman Bruner was on the scene. When Lynn arrived, he saw a body lying under a tan bedspread in front of a white frame house. Removing the bedspread, Lynn saw the body of Rena Mae Callins, lying on her left side; the left side of her face was missing, it appearing to have been blown away. The major part of the victim's brain was lying beside her right foot.
Lynn further testified that the scene was secured, closed off by ropes on each end of that block of houses. While on the scene, Lynn conducted a search for human tissue, locating two of the victim's fingers one hundred and twenty-eight feet east of the body, one finger ninety feet east of the body, and a number of pieces of flesh and bone matter in an area one hundred and twenty-eight feet east of the body to forty feet west of the body.
A search of the area by Lynn turned up numerous items; his inventory follows:
 "Q. Would you tell us what you found on the street there?
 "A. . . . . Found what appeared to be a spring from a clock at the intersection of East North Street and College Street and found one piece of a metal clamp found 7 feet, 10 inches north on the north edge of North College Street. Found one small nut on the south side of East North Street along with a small piece of round metal. One round metal cap on the north side of East North Street. One round metal washer 24 feet, 2 inches from North College Street. One round metal rod with screws on each end and a round metal disc in the center. One piece of black plastic material, appeared to be part of a battery.
"MR. HERRING: Object to what it appeared to be.
 "THE COURT: Yes. Sustained. If you will, just tell us what you found.
 "THE WITNESS: One piece of threaded pipe at the same location that we found the two small metal objects, one metal washer and one metal cap. Two small pieces of masking tape, white in color found in the yard at 133 East North Street. One piece of battery in the yard of 133 East North Street. One piece of a coat hanger 148 feet, 8 inches west of North College Street in the center of the roadway. Or approximately 24 feet from the center of the roadway in the yard of *Page 216 
129 East North Street. One piece of threaded pipe laying against the east wall of the house at, 20 feet from the east wall at 129 East North. One large piece of metal pipe 163 feet, 6 inches west of North College Street, approximately 3 feet north of the center line. One small piece of black electrician's tape laying against the south curb of East North Street 172 feet, 10 inches west of North College. One small piece of metal cap found on the southern curb of East North Street. One piece of treated metal pipe 181 feet, 10 inches west of North College Street on the south curb. One piece of threaded metal found on the sidewalk approximately 15 feet from the center of the roadway, 188 feet west of North College. It was directly in front of 130 East North Street. One piece of metal, piece of pipe approximately 2 inches in diameter. The projectile went through the front wall of 130 East North Street, penetrated a one inch board in the outside of the house and then through a one inch piece of plywood and paneling and penetrated the back of a chest of drawers and the back of the chest of drawers was approximately 1/2 inch deep. It was resting inside of some clothing inside a drawer. The projectile entered the front of the house 196 feet, 9 inches west of North College Street, approximately 29 feet south of the center of the roadway. One piece of white masking tape was found in the yard at 127 East North Street. One piece of metal pipe, 246 feet, 8 inches west of North College Street, approximately 19 feet north of the center line of the roadway. One 2 inch bolt, 250 feet, 3 inches west of North College Street, approximately 18 feet north of the center of the roadway. One metal bolt, 250 feet, 1 inch west of North College Street on the north edge of the roadway. One round piece of metal, 278 feet, 3 inches west of North College Street, 17 feet north of the center of the roadway. Another piece of round metal threaded pipe was lodged in the door of the victim's house at 129 East North Street. Picked up several pieces of metal and parts from the walls and the floor at the victim's home at 129 East North Street. We swept the front porch and the step area around the body where the victim was laying. A piece of electrical apparatus was found on the front porch of 133 East North. One battery was found in a wooden produce basket on the front of the house on 129 East North Street. Metal fragments from the metal threaded pipe from the rafters and the loft of 129 East North Street. A small piece of metal embedded in the floor of the porch behind the screened, hinged door at 129 East North Street. Also a piece of tape found along with the metal. One large thick metal washer, small metal cap, piece of circular yellow plastic by the curb on the north side of the street, approximately 124 feet west of North College on East North Street."
* * * * * *
 "Q. Did you observe any powder of any kind there at the scene?
"A. Yes, sir.
"Q. Could you recognize what kind of powder that was?
"A. Yes, sir.
"Q. What kind of powder was it?
"Q. It was a smokeless powder of some type."
In gathering up these items, Lynn was aided by Dale Carter of the Enterprise Crime Laboratory. Carter bagged the evidence as Lynn picked it up and sealed the items, initialling each bag. Each of these small bags was placed in one large bag and turned over to Agent T.D. Dubose of A.T.F.
Valioa Powell testified that she knew Rena Mae Callins and spent the night at her house the night before she died. She woke up at nine o'clock that morning; Rena Mae was already up. Valioa and Rena Mae called a friend and, after talking to him, went out on the front porch. On the porch was what appeared to be a drink can in a plastic bag. Rena Mae picked it up and gave it to Valioa, who gave it back, telling Rena Mae to throw it away. Rena Mae *Page 217 
drew back her arm to throw the bag away, when the thing exploded. At that time, Valioa was standing next to Rena Mae and she ran into the house when the explosion occurred.
On cross-examination, Valioa testified that Rena Mae was her first cousin. When the explosion occurred, Valioa's face, arms, and clothes were sprayed with a white powder; she was also hit in the head by a piece of wire. Eddie and Salina, Valioa's sisters, who had also spent the night, ran out on the porch right after the explosion.
Larry Lynn was then recalled to testify; he stated that articles recovered at the scene were placed in thirty-two small bags and then placed in one container. These items were in the same condition as when they were recovered from the scene. However, the trial court did not admit these items, concluding they had not yet been connected up.
Later that day, Lynn testified, he aided Deputy Jimmy Hand in executing a search warrant for appellant's home in Hartford, Alabama. There, in the living room, Lynn found half of a can of smokeless powder and a box labeled "micro mercury switches." In the bedroom, Lynn found a rubber glove with gunpowder on it, gunpowder spilled on the surface of a dresser and several pieces of electrical wire. Near the bed was a book entitled "Explosives and Bomb Disposal Guide." This book was checked out from the George S. Houston Memorial Library in Dothan by appellant and was stamped due to be returned on August 19, 1977. These articles were all in the same condition as when they had been found, Lynn testified.
On voir dire examination, Lynn stated that the smokeless powder could be purchased by people generally, and that it was commonly used for reloading pistol ammunition. Mercury switches are generally used in thermostats. However, Lynn had previously testified that no reloading equipment was present in the house; nor was there a central heating or cooling system.
At this time the book, "Explosives and Bomb Disposal Guide", was admitted into evidence over appellant's objection on the ground that it was irrelevant.
Lynn further testified that he lifted prints from the can of gunpowder and sent them to the Alabama Bureau of Investigation, asking that they be compared with appellant's fingerprints. In addition to all the other items that he found on the scene, Lynn testified that he also discovered a piece of cardboard from which a circular pattern had been cut.
Jack Still testified that he was the Coroner in Houston County, Alabama. On August 16, 1977, Still went to 129 East North Street in Houston County, where he examined the body of Rena Mae Callins. Still observed that the victim's left hand and the left portion of her skull had been blown away. Surrounding the victim's body, which was covered with powder stippling, were pieces of pipe and other debris. Still concluded that the victim was killed by "some type of bomb explosion." In Still's opinion the explosion occurred "very close" to the body.
On cross-examination Still explained that "stippling" is similar to powder burn. The powder "gets under the skin" and causes a red marking.
Richard Dale Carter testified that he was employed by the Enterprise Laboratory of the Alabama Department of Toxicology and Criminal Investigation. Carter had been employed there for seven years and had received extensive training at institutions of higher education. On August 16, 1977, Carter was sent to 129 East North Street where he saw Jack Still. On the scene Carter observed the body of Rena Mae Callins and noted that there were several areas of powder stippling on her body. Subsequently, that day, Carter was present at a post-mortem examination of the victim's body, conducted by Van Pruitt. Tape lifts of powder were taken from the child's left arm, left chest, right arm and right leg. Carter further testified that Dr. Pruitt removed the victim's clothes, turned them over to him, and that he turned the clothes, in the same condition as when they were *Page 218 
removed from the body, over to Lieutenant Stokes.
L.E. Stokes testified that he was a lieutenant with the Dothan Police Department and that he commanded the Department's Criminal Investigation Division. Stokes testified that he received a package, containing female clothing, and clear tapes on a 3 X 5 index card, from Dale Carter on August 17, 1977. Stokes placed these items in a locked evidence room, where they remained until Stokes turned them over to A.T.F. Agent Dubose.
T.D. Dubose testified that he was employed by the Federal Bureau of Alcohol, Tobacco, and Firearms as a special agent, working out of Montgomery, Alabama. On August 16, 1977, Dubose was requested to assist the Dothan Police Department in an investigation. When Dubose arrived in Dothan, he went to 129 East North Street, and later saw Sergeant Lynn at the Police Department. At that time Lynn turned over to Dubose a bag containing numerous items. Each of these items was checked by Dubose and sent to a laboratory in Atlanta, Georgia, for examination by a chemist, Walter Mitchell. These items were all sent back to Dubose by registered mail, a few of them having been altered by the chemical analysis. Dubose then transported the evidence to a Mr. Casey, employed by the Explosive Technology Branch of the Bureau, in Washington, D.C. Dubose again received these items through registered mail, examined them, and determined that they were in their original condition.
Dubose further testified that he participated in the search of appellant's vehicle on August 16, 1977, removing each item seized and packaged at that time. Taken from the driver's compartment of the car were:
 ". . . a package of flash bulbs, a roll of adhesive tape, a glo plug, Fox glo plug, a 9 volt Eveready battery with a cat on the front of it. A roll of
 black electrician's tape, a screwdriver and a pair of tweezers. And another one of those Fox glo plugs, all removed from the driver's compartment of the car."
From the trunk of the car, Dubose took a roll of black tape, three rubber spacers taped together, a metal washer, a metal cap, and another spacer surrounded by a cap. All of these items, sent to Atlanta, were returned in the same condition as when they were seized. Dubose also testified that he received the articles of clothing and powder lifts from Lt. Stokes. These were sent to Atlanta and returned in the same condition.
Sharon Granger testified that she lived next door to Rena Mae Callins before she was killed. On the morning of the fatal incident, Sharon was sitting on the front porch of her house when she heard something that "sounded kind of like a gun;" immediately thereafter she saw Rena Mae lying at the bottom of the steps of the porch next door.
David Seay testified that he was employed by Seco Electric on August 16, 1977, and that he knew appellant who also worked for the same company. Seay picked up appellant about 7:00 a.m., on August 16, 1977, at Tom's Restaurant in Dothan and drove to Abbeville to run "conduit," a galvanized pipe, on a jobsite there. The pipe they were installing had a 2 1/2 inch diameter.
Approximately a week before the day in question, Seay testified, he, appellant, and Paul Spivey, a co-worker, had a conversation on the way to a job in Bainbridge, Georgia. Appellant asked if the two men knew how to make a bomb and told them that he had made one and set it off in a field in Hartford, Alabama. The day before Rena Mae Callins was killed, appellant had left work at lunch time for an alleged dental appointment.
Paul Spivey testified that he was employed by Seco Electric on August 16, 1977, as a journeyman electrician. Spivey recounted the same conversation as Seay did.
Doris Wymes testified that she lived at 1806 Kinsey Road and that she had known appellant approximately two years. Ms. Wymes had dated appellant and broke off the relationship about three months before the death of Rena Mae Callins, her niece. *Page 219 
Appellant and Ms. Wymes had lived together for a period of time during their relationship. Ms. Wymes further testified that she and appellant had some difficulties after they broke up. Appellant told Ms. Wymes, ". . . I will get you and your family, too. When she asked appellant what he meant he replied that she would find out.
Usually Ms. Wymes and her mother visited at 129 East North Street on Mondays and Tuesdays to can peas for the freezer. Ms. Wymes' mother had those two days off from work.
On the day before Rena Mae was killed, Ms. Wymes testified, she received a postcard in the mail. After Ms. Wymes identified the handwriting on the card as that of appellant, the writing was admitted into evidence without objection. The message of the card is set out below:
 "Too bad you don't enjoy life no more. What a waste. I had a great time I wish you an un happy birthday."
Ms. Wymes further testified that three or four months before Rena Mae was killed appellant told her that he could make a bomb if he wanted to do so. One week before the day in question, appellant drove by her mother's house while she, her mother, and some friends were present and threw something up into the yard. This was immediately followed by what sounded like a shotgun blast; Ms. Wymes did not know what it was. Then the next Tuesday, Rena Mae was killed.
Wayne Love testified that he was the director of the Houston Memorial Library in Dothan and that in that capacity he was custodian of the records. Love testified that library records indicated that a book entitled "Explosives and Bomb Disposal Guide" was checked out on a card issued to appellant.
Joseph Wise testified that he was a counter salesman for Mack Electric Supply Company. On August 10, 1977, Wise sold a micro mercury switch to a person who identified himself as appellant. A sales slip recording the transaction was admitted into evidence without objection.
Mike Jones testified that he was employed by the City of Abbeville Police Department. On August 16, 1977, he arrested appellant at Alabama Forestry Products. Later that day Sergeant Harold Locke came to that police department. Appellant was wearing the same clothes as when he was arrested.
Harold Locke testified that he was a sergeant for the Dothan Police Department, assigned to the Criminal Investigation Division. On August 16, 1977, Locke went to the Abbeville Police Station where he observed appellant and the clothes he was wearing. Locke transported appellant back to Dothan; at the police station Officer Lynn obtained some clothes from appellant. These were placed in a bag and locked in the evidence room.
Edward Leon Baxter testified that he was employed by the Houston County Sheriff's Office. Baxter testified that he fingerprinted appellant on August 16, 1977. That card which he made was admitted into evidence without objection.
Larry Lynn was then recalled to testify. Lynn stated that he sent a photograph of the fingerprint lifts taken from the gunpowder can at appellant's home to a fingerprint expert in Montgomery. Those photographs were admitted in evidence without objection. Lynn further testified that the clothes obtained from appellant were turned over to Agent T.D. Dubose. A neutron activation analysis swab test was conducted by Lynn on appellant to determine whether or not he had handled any explosives. The test swab was also turned over to Dubose.
Edward Burkett testified that he was employed by the Alabama Bureau of Investigation as a fingerprint classifier. Burkett then listed his duties and qualifications for his job. Burkett compared the latent print lift to the ink print made by Baxter and stated that in his opinion the prints lifted from the gunpowder can were those of appellant.
T.D. Dubose was then recalled; he testified that the clothes of appellant that he received from Officer Lynn were taken to *Page 220 
the laboratory in Atlanta by him to Walter Mitchell.
Charles Henderson testified that he had known appellant approximately a year and a half. The night before Rena Mae Callins was killed, Henderson went to appellant's house to ask about some stereo speakers. Appellant asked Henderson if he could borrow a rifle and told Henderson that "he didn't care," when Henderson could not give him the weapon because some people in Dothan didn't like him. Appellant then told him that before Henderson had come over to the house he had been making a bomb.
Walter Mitchell testified that he was employed by the Bureau of Alcohol, Tobacco, and Firearms as a chemist in the Bureau's Laboratory in Atlanta. Mitchell identified a blue shirt, boots and a pair of blue pants as articles of clothing given to him by Agent Dubose. Also identified by Mitchell were the thirty-two small bags of fragments which in his opinion, were part of a bomb. This opinion was based upon the way the fragments had been "stressed" ripped; and the condition of the wire coverings, the battery parts, and tape. Mitchell further testified that he did not know how the material gathered at the scene could have been torn apart as they were by any other means than an explosion. At this time all the particles and fragments were admitted into evidence over the appellant's objection that their relevancy had not been shown. The trial court asked the witness, "You mean everything that is in this pile here was part of some bomb or explosive device?" The witness then reiterated that they were "under the stress of an explosion."
Mitchell further testified that wires recovered at appellant's house and wire recovered at the scene of the blast each had thirty-three copper wire strands which were the same size, .001 inches. These different sets of wires were subjected to microscopic examination and chemical analysis, the result being that they were the same type out of thousands of possible combinations of wire type and coating. These wires were admitted into evidence without objection.
Included in the debris recovered at the scene, Mitchell testified, were parts of a battery large enough to allow him to determine that they came from a no. 216NEDA1604 9 volt Eveready battery, which was stamped on one of the fragments. In evidence received from appellant's car, Mitchell testified, there was an Eveready 9 volt no. 216NEDA1604 battery. A piece of light blue plastic recovered at the scene matched the plastic of flashbulbs recovered from appellant's car. Tape taken from appellant's home and car was of the same chemical analysis as tape recovered from the bomb scene. Powder samples taken from the victim's clothing and defendant's clothing had the same physical and chemical characteristics, as did powder from the appellant's residence and samples from the bomb scene. Mitchell also found in a mercury switch box from appellant's residence a lead wire from a mercury switch, which he determined was sold nowhere in the southeastern United States except Dothan, Alabama. The rubber glove recovered at appellant's home was subjected to analysis and determined by Mitchell to have gunpowder on it of the same type he had previously testified to.
Lawrence Eugene Casey testified that he was employed in Washington, D.C., by the Bureau of Alcohol, Tobacco, and Firearms United States Treasury Department. Casey worked as an Explosive Enforcement Specialist, assisting state and local officials in investigations of violations of bombing and explosives laws. Having commanded a bomb disposal unit in the United States Army, Casey was also a bomb technician for the Oklahoma Bureau of Investigation for four years, a consultant to the International Association of Chiefs of Police, and an Explosive Disposal Officer in the United States Army Reserve. Casey also wrote training material on bomb investigation and disposal.
Casey further testified that he examined the debris recovered from the scene and determined from what type of device they had come and how such a device functioned. *Page 221 
Based on the evidence before him, Casey formed the opinion that the device was an explosive pipe bomb, functioning by "antidisturbance or antimovement." This, Casey testified, means that the device would normally explode when moved.
Based upon a hypothetical question positing a rotation of the device 90 degrees by the victim, Casey explained the operation of the bomb as follows:
 "A. The movement of a package in two different planes of movement in a 90 degree movement of the package would indicate that the device functioned by an antidisturbance or antimovement fusing system.
"Q. All right. What is an antimovement fusing system?
 "A. There are many components that can be used to construct the fusing system that is activated by movement. But one of the primary examples of the fusing system of this manner is using what is commonly called a mercury switch. A mercury switch simply allows electricity to flow through the electrical circuit when movement is applied to that component or through that mercury switch.
 "Q. All right. Now, is there any kind of, in order for there to be any kind of safety factor in building one of these bombs, is there anything needed to keep that mercury switch stationary?
 "A. The bomber would have a choice of either two methods of making the device safe until he was ready to utilize it. And one would be the making of his final connection or completing of the circuit at the location that he is going to plant the device. The obvious hazard to that selection is if he has constructed his device incorrectly or placed it in an incorrect position when he makes his final connection. The device could function with him present at the scene and inflict damage on him. The solution to that problem is by using some type of remote arming switch or mechanism which timing devices are commonly employed or used to close that circuit for him and give him enough time to get away from the bombing scene.
 "Q. Is there anything that is used to keep the mercury switch itself stable?
 "A. The mercury switch needs to be placed in a known orientation or position so that the bomber knows when he sets the package down and it becomes armed that the item will not automatically detonate or explode until such time as the victim or the person for which the bomb is intended actually picks the bomb up, allowing him to position that mercury switch at the bombing location of position. The bomber could use a number of materials to cause that positioning to be known. He could use tape or pieces of wood or cardboard or any hard material that would allow him to preposition that switch in a known position.
"Q. How would he utilize cardboard in doing that?
 "A. He could utilize a piece of cardboard, cut or positioned to allow him to insert the mercury switch in a hole in the cardboard or in similar functions that uses the material or cardboard to brace that switch in the known position."
Having sifted through the debris recovered at the scene, Casey reconstructed a device using such a fuse system. In particular he noted the presence of the cardboard fragments, flashbulb fragments, and portions of a mercury switch. Casey observed that such a device is antipersonnel rather than antiproperty in nature.
 "Q. All right. What, what are the usual consequences on a bomb of this nature, a booby trap bomb on any victim?
 "A. The insidious nature of a booby trapped circuit or booby trap bomb is the fact that it is detonated or exploded by the victim which is unsuspecting of its action. It requires the movement of the package, usually caused by the victim. This insures that the victim to be will be in close proximity to the explosion when it occurs."
Casey also testified that he was familiar with "Explosives and Bomb Disposal Guide," describing it as a widely used textbook in bomb investigation and disposal *Page 222 
techniques. This book discussed fully each of the factors requisite to the construction of such an explosive device.
At this time the State rested and appellant made the following motion.
 "MR. HERRING: Judge, at this time the Defendant would move to exclude the State's evidence on the grounds that they have failed to prove a prima facie case.
"THE COURT: Okay. Do you want to offer any argument?
 "MR. HERRING: Judge, I would like to point out to the Court that there has been no testimony to show that this Defendant intentionally placed any sort of explosive device at the site of the crime. There is nothing to connect him with the intentional act that is complained of in the indictment. We feel that the State has failed to make out a case on that basis and the fact that the intentionalness of the act has not been shown, nor has it been shown that the Defendant actually committed the act complained of."
This motion was denied.
Appellant then called Lou Paul, who testified that she had known appellant and his wife Rosetta a "good while." Ms. Paul saw appellant standing by his car on the morning that Rena Mae Callins was killed; however, she just noticed that the hood was up in the car, and she didn't remember anything else.
William Crawford testified that he had known appellant over a year. On the morning Rena Mae Callins was killed, Crawford saw appellant at about 6 o'clock. Appellant and Crawford talked for a few minutes.
Marjorie Callins testified that she was the mother of Rena Mae Callins and that she had known appellant since he had been dating her sister Doris Wymes. Appellant had never threatened her, Mrs. Callins testified; however, he had called her son Randy a "Black son-of-a-bitch" about a month before Rena Mae was killed. On Sunday night, the night before Rena Mae died, Mrs. Callins did see appellant drive by the house. Doris Wymes and her mother were at the house at the time, and their car was parked out in front of the house.
Horace Fred Chamblis testified that he had checked the mileage from appellant's home in Hartford, Alabama, to 129 East North Street in Dothan, Alabama. By the shortest route that Chamblis discovered, the trip took forty-eight minutes at the posted speed limit.
Appellant testified that he had not made the bomb that killed Rena Mae Callins. Although he admitted that he had bought smokeless powder, a mercury switch and made round cardboard cutouts, these things were all used in repairs on his automobile. In particular, the gunpowder was used to help firm lead to build a battery terminal in his car. Appellant denied having purchased the powder at Dothan Shooter Supply, and saying that the powder was to be used to feed his dog and make it mean.
In rebuttal, Danny Hornsby testified that he sold appellant a pound of smokeless powder at Dothan Shooter about a month and a half before Rena Mae Callins was killed. Appellant told him that he was going to feed the powder to his dog to make it mean.
Charles Henderson testified that he visited appellant in jail in December. Appellant asked Henderson if he could have been mistaken about a bomb being mentioned during the conversation they had the night before Rena Mae Callins was killed. Henderson testified that he was not mistaken.
Larry Casey testified that in his opinion a battery terminal could not have been formed by the process described by appellant. However, this was excluded by the trial court on appellant's motion following voir dire examination revealing that Casey had not attempted such a process before.
This concluded the testimony in this case.
As can be seen from the recital of the facts, the amount of evidence presented was voluminous, entirely circumstantial, and in total conflict, appellant denying any involvement in the death of Rena Mae Callins. However, circumstantial evidence is entitled to the same weight as direct evidence, provided it points toward the guilt of the accused. Woods v. State, *Page 223 
Ala.Cr.App., 344 So.2d 1225. Conflicting evidence is always a question for the jury to determine. Lee v. State, Ala.Cr.App.,346 So.2d 31.
Here the evidence presented by the State was more than enough from which the jury could infer that appellant placed an explosive device on the front porch or steps of the victim's home. His intention to kill the victim is evident from the fact that the device had to be triggered by the victim herself.
Appellant contends that Act 213, 1975 Ala. Acts, page 701 etseq., now Sections 13-11-2, et seq., Alabama Code 1975, is unconstitutional. The constitutionality of this law is no longer an open question in this State. On May 19, 1978, the Supreme Court of Alabama, in Ex parte Jerry Wayne Jacobs, Ala.,361 So.2d 640 (In re Jerry Wayne Jacobs v. State of Alabama)
affirmed this Court's opinion in upholding the conviction of murder, including the sentence of death, and holding the Act constitutional. On August 11, 1978, the Alabama Supreme Court in denying Jacobs' application for rehearing took note of the cases of Bell v. Ohio, 438 U.S. 637, 98 S.Ct. 2977,57 L.Ed.2d 1010 and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954,57 L.Ed.2d 973 and concluded that those cases do not invalidate Alabama's sentencing scheme in death cases.
At the sentencing hearing in this case appellant's counsel made known to the Court that the defendant did not wish to present any testimony tending to show mitigating circumstances but insisted the defendant still maintains his innocence. Both sides presented legal arguments and rested.
From the record:
 "THE COURT: All right. The Court hereby finds that under Section 13-11-6 of the Code of Alabama of 1975 and from the evidence that was presented in this case, that the following aggravating circumstances exist. I find that you knowingly created great risk of death to many persons. And I further find that the felony which was committed by you was an especially heinous, atrocious and cruel act. And based upon that, I hereby order that on May 25, 1978, that the Warden of William C. Holman Unit of the Alabama Prison System, within the walls of the said William C. Holman Unit of the Alabama Prison System, shall cause to pass through your body a current of electricity of sufficient intensity to cause death. And that application and intensity of such current through your body shall continue until you are dead.
"All right. He is in your custody."
Section 13-11-4, Ala. Code 1975 provides, in pertinent part, as follows:
 "If the Court imposes a sentence of death, it shall set forth in writing, as the basis for the sentence of death, findings of fact from the trial and the sentence hearing, which shall at least include the following:
 "(1) One or more of the aggravating circumstances enumerated in section 13-11-6, which it finds exists in the case and which it finds sufficient to support the sentence of death; and
 "(2) Any of the mitigating circumstances enumerated in section 13-11-7 which it finds insufficient to outweigh the aggravating circumstances."
Chief Justice Torbert in his concurring opinion in the Jacobs
case, supra, said:
 "The Court of Criminal Appeals and this Court, by statute (Section 12-22-150, Code of Alabama 1975) and by Court rule (amended Rule 39 (c), Ala.R.App.P.) respectively, must review the decision of the trial court where the death penalty is imposed. This mandatory review guarantees that, before a defendant can be executed in Alabama, the sentence of death must be found appropriate by both the Court of Criminal Appeals and this court after a review of the aggravating and mitigating circumstances found in the case by the trial judge.
 "However, this appellate review safeguard — a substantial protection for the defendant in Alabama — is nonexistent unless the trial judge conducts a full and fair sentencing hearing and enters complete *Page 224 written findings as to aggravating and mitigating circumstances. * * *"
(Emphasis supplied)
The trial court set a sentencing hearing but he did not enter "complete written findings as to aggravating and mitigating circumstances."
The sentencing hearing is one of the most important and critical stages under Alabama's death penalty law. The guilt stage has passed. Now an experienced trial judge must consider the particularized circumstances surrounding the offense and the offender and determine if the accused is to die or be sentenced to life imprisonment without parole. It is a due process hearing of the highest magnitude and the exclusionary rules of evidence play no part. The trial evidence must be reviewed to determine all of the aggravating circumstances leading up to and culminating in the death of the victim and then all the mitigating circumstances must be considered in determining if any outweigh the aggravating circumstances so found in the trial court's findings of fact. Unless and until this is done "the trial judge cannot fairly weigh the aggravating and mitigating circumstances, and the appellate court cannot adequately review his sentencing decision."
Prior to the date set for the hearing the trial court shall order a pre-sentence report and furnish the defendant and his attorney with a copy of same. The defendant must be afforded the opportunity to adduce any testimony which has any probative value that will enable the court to perform its constitutional responsibility for the question of whether a man should live or die is not to be treated as a mere formality.
In Jacobs, supra, the Chief Justice wrote:
 "The sentencing hearing must not be a constitutional facade; though the burden of establishing mitigating circumstances must realistically rest with the defendant (citing cases), this does not relieve the trial court from the requirement of due process in the sentencing hearing. Gardner v. Florida, 430 U.S. 349 (1977); State v. Lee, 114 Ariz. 101, 559 P.2d 657
(1976). In Nebraska the trial court in capital cases must order a presentence investigation and must set out a general order of procedure prior to the commencement of the sentencing hearing. (Citing another Nebraska case). In other words, the sentencing hearing must involve a serious attempt to examine the aggravating and mitigating factors surrounding the offense and the offender. The defendant cannot waive this right to due process through the failure of his attorney to make an objection. Gardner v. Florida, supra."
Accordingly, this case is remanded to the Circuit Court of Houston County to make and enter a full and complete written finding as to the aggravating and mitigating circumstances including "findings of fact from the trial and the sentence hearing," with the defendant and his trial counsel present.
The trial court is further directed that a full record be made of this hearing, which should be conducted expeditiously, and a transcript of these proceedings under the Seal of the Clerk be promptly forwarded to this Court.
Remanded for further proceedings in accordance with this opinion.
All the Judges concur.
 After Remandment
This case was remanded to the trial court to hold another sentencing hearing and to enter "complete written findings as to the aggravating and mitigating circumstances," based upon the evidence at trial. The Court was further directed to secure a presentence report and furnish the defendant and his attorney with a copy of same and to afford the defendant the opportunity to adduce any testimony that he may wish to present.
At the first sentencing hearing appellant's counsel made known to the court that the defendant did not wish to present any testimony tending to show any mitigating circumstances. *Page 225 
At the rescheduled hearing set for October 27, 1978, a presentence report was furnished to the defendant and his counsel. Appellant called Reverend J.C. McCleod as a witness in his behalf. Appellant also testified and filed a written statement in which he denied his guilt. Both sides made lengthy legal arguments on the law and the evidence.
Reverend McCleod testified that he had known the appellant for about three years and sometimes he attended church with his family. He found appellant to be a very intelligent man and that he had a reputation for being peaceful and minding his own business. His only contact with appellant was related to church affairs and he was a "very active man, a very knowledgeable, very sensible and quiet man during our meetings."
On cross-examination he stated that he did not know of any problems appellant had in Dothan, Alabama, New York or North Carolina. He further testified that there was some defective electrical wiring in the church and appellant repaired the wiring without making a charge for his work.
Appellant was sworn as a witness and the following occurred:
From the record:
 "THE WITNESS: I will have to read this. (Witness reading from some papers.) I was tried under a statute which is punishable by death when a person has intent to kill by an explosion. I emphasize the killing. I understand this to mean that the victim was the intended victim of the explosion by the Defendant. Okay. The statute does not say when a person is killed by the Defendant, but it plainly states intentionally killed. I also realize that intent can be or may be inferred by the use of a deadly weapon. But the statute I was tried under has two elements. One being willfully setting off an explosion near a human inhabitant and secondly, intent to kill the person. Each element has its own principle and its own foundation. Therefore, intentionality demands its own proof in evidence. Not an inference from the nature or character of the weapon used. If intentionality can be inferred, then the purpose of the statute is defeated and it is reduced to a single act instead of two acts that this statute sets out and requires. It has been said that the mere fact that the device had to be triggered by the victim is evidence of intent to kill the victim. Well here again, the character of the weapon is being used to infer intent. It is a twofold statute stands defeated, reduced to a single act. The Code Title also states that the offense charged shall not include any lesser offenses. This too I think, must fail, because of the evidence presented by the State does include a lesser offense. Okay. The State's own evidence reduces any presumption of Rena Mae Callin being killed intentionally. There is no evidence of prior difficulty between the Defendant, myself, and the victim. The victim's own mother testified to this in evidence for the Record. It shows no malice or threat to the mother or the victim in this case by the Defendant. That intends to prove Rena Mae Callins was killed intentionally. The State's Case in chief and theme and theory shows that the victim was killed as a result of an explosion meant for someone else. Okay. The State's Evidence pointed to Doris Williams and Emma Williams as being the actual intended victim. The State went to great lengths to show prior difficulty between the Defendant and Doris Williams, along with her mother, Mrs. Emma Williams. The State put on testimony tending to show that the Defendant knew Doris Williams and Emma Williams would be at the site of the explosion, I mean, testimony tends to show this. At no time in any form is it evidence that Rena Mae Callins was the intended victim as to show that she was intentionally killed by the Defendant, because of the explosion. Okay. The inference drawn from the mechanics of the device is that it had to be triggered by the victim does not mean that the one that triggered it was the intended victim. Even if one was to consider this a fact *Page 226 
and not a conclusion, it is still heavily outweighed by the evidence presented by the State against any presumption that Rena Mae Callins was killed intentionally by the Defendant. I offer this statement in my own behalf of mitigating circumstances against the imposition of the death penalty. And in no way is this statement to be looked upon as an admission of guilt, because wholeheartedly I maintain my innocence. I would like to go further and comment on the trial itself. I would like to mention the reason I feel that the death penalty should not be imposed on me for one reason is the Prosecutor I think, severely damaged my character and severely damaged my own defense by mentioning false accusations where he admitted, he said in front of the Jury like I served two years which was actually false, to incriminate me. And then he said I killed a woman in New Jersey, which was incriminating. And that I made bombs in Vietnam, which he knew, he had a paper in his hand and knew that this was not true. So, I don't feel that you can give a man a death sentence when you have people telling outright lies. So, I feel that this Court did not cure the accusations in the mind of the Jury. Also, I believe that the post card sent to Doris Williams should not have been admissible in the sense that she herself was saying her birthday was on the 16th when in actuality it was not. It was on the 15th, August 15th. This is the Prosecutor made the card look like it was such an incriminating thing, a threat. And actually, she took the stand herself and said her birthday was on the 16th and in reality it was on the 15th. This is the reason I think it shouldn't be imposed, because actually, it was no fair trial. And I think this is a guarantee of any man, the least you can give him is a fair trial before you impose anything as severe as the death penalty. That is it."
The presentence report reveals that appellant had previous convictions in North Carolina for assault on a female and was sentenced to 30 days on the County Roads and placed on probation for two years in 1967. He was convicted of assault on a female in 1969 and was sentenced to 30 days on the County Farm. He was also sentenced to 30 days on the County Farm for damage to personal property in Wilmington. He was convicted for Breach of the Peace in the District Court of Houston County, Alabama, and sentenced to 12 months. He appealed this conviction and the appeal was pending when he was arrested for the crime of murder for which he now stands convicted.
The trial court made the following written findings in support of the imposition of the death sentence:
"ORDER ON HEARING AS TO IMPOSITION OF DEATH SENTENCE
 "The Court, having conducted a rehearing pursuant to Section 13-11-3, Code of Alabama 1975, in accordance with order of the Court of Criminal Appeals of Alabama, of October 3, 1978, to determine whether or not the Court will sentence Herbert Lee Richardson to death or to life imprisonment without parole; and the Court having considered the evidence presented at the trial, the evidence at the sentence hearing and a presentence hearing prepared by the Probation Officer of Houston County, Alabama; the Court makes the following findings of fact:
 "The Court first considers the aggravating circumstances as described in Section 13-11-6, Code of Alabama 1975:
 "(a) The Court finds that the capital felony was not committed by Herbert Lee Richardson while he was under sentence of imprisonment.
 "(b) The Court finds no evidence that Herbert Lee Richardson was previously convicted of another capital felony or any felony involving the use or threat of violence to any person.
 "(c) The Court finds that the Defendant, Herbert Lee Richardson, knowingly created a great risk of death to many persons by the commission of the present capital felony. The testimony on the trial of this case convinced the Court that Herbert Lee Richardson placed a bomb on the front porch of an inhabited dwelling *Page 227 
in a heavily populated residential area of Dothan, Alabama; that at the time and on the occasion that Herbert Lee Richardson placed the subject bomb on the front porch of the dwelling house, said house was inhabited by several minor children and adults.
 "(d) The Court finds no evidence that the capital felony was committed while the Defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping for ransom.
 "(e) The Court finds that the capital felony was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
 "(f) The Court finds that the capital felony was not committed for pecuniary gain.
 "(g) The Court finds that the capital felony was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
 "(h) The Court finds that the capital felony was especially heinous, atrocious and cruel. The Court finds from the evidence that the Defendant, Herbert Lee Richardson, made or assembled a bomb that is known as an antidisturbance or antimovement bomb; that such bombs are created for the purpose of killing people as opposed to destroying property; that the Defendant placed this bomb on the front porch of a house which was inhabited by several minor children and adults in a heavily populated residential area of the City of Dothan; that the victim, Rena Mae Callins, was a ten year old child; that when the victim attempted to throw or dispose of the bomb, it exploded and blew parts of her body over a two-block area.
 "The Court now considers mitigating circumstances as described in Section 13-11-7, Code of Alabama 1975,:
 "(a) The Court finds that Herbert Lee Richardson has a significant history of prior criminal activity having been previously convicted on two occasions of assault on a female in the State of North Carolina.
 "(b) The Court finds that capital felony was not committed while Herbert Lee Richardson was under the influence of extreme mental or emotional disturbance.
 "(c) The Court finds that the victim, Rena Mae Callins, was not a participant in the Defendant's conduct nor did the victim consent to his act.
 "(d) The Court finds that Herbert Lee Richardson was not an accomplice in the capital felony committed, but was, in fact, the principal who created the bomb and placed it so that the victim came into possession of it thereby causing her death.
 "(e) The Court finds that Herbert Lee Richardson did not act under extreme duress or under the substantial domination of another person.
 "(f) The Court finds that the capacity of Herbert Lee Richardson to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired and was not, in fact, impaired in any degree.
 "(g) The Court finds that Herbert Lee Richardson's age at the time of the crime is not a mitigating circumstance.
 "The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances; it is the judgment of the Court that the death penalty as fixed by the jury should be and is hereby accepted.
 "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that Herbert Lee Richardson, is guilty of the capital felony charged in the Indictment specifically of willfully setting off or exploding dynamite or other explosive in, under or dangerously near an inhabited dwelling house and intentionally killing a person because of the explosion.
 "THE COURT THEREFORE ORDERS AND ADJUDGES THAT YOU, Herbert Lee Richardson, suffer death by electrocution at any time before the hour of *Page 228 
sunrise on the 3rd day of February, 1979, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
 "IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that the Warden of William C. Holman Unit of the Prison System at Atmore, Alabama, or in case of his death, disability or absence, his deputy, or in the event of the death, disability or absence of both the Warden and his deputy, the person appointed by the Commissioner of Corrections, at any time before the hour of sunrise, shall on the 3rd day of February, 1979, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Herbert Lee Richardson, a current of electricity of sufficient intensity to cause his death, and the continuance of the application of such current through the body of Herbert Lee Richardson until the said Herbert Lee Richardson, be dead. MAY GOD HAVE MERCY ON YOUR SOUL.
"DONE AND ORDERED this 27th day of October, 1978.
 /s/ Jerry M. White
JUDGE, TWENTIETH JUDICIAL CIRCUIT OF ALABAMA
"Filed in office this 27 day of October, 1978.
 /s/ Julia L. Traut
Clerk
"Recorded in Minute Book No. 32; Page 161"
We are in full accord with the findings of the trial court and find that they are fully supported by the evidence in this case. Only a cunning and diabolical mind could have constructed such an insidious and death dealing device. This murder of a helpless, defenseless and innocent child is one of the most cruel, atrocious and heinous crimes in the annals of human depravity. Such a crime is deserving of no sentence but death.
The judgment of conviction and the sentence of death is affirmed.
AFFIRMED.
All the Judges concur.