TYSON, Judge.
This cause is an appeal by the State of Alabama from the granting of a motion to suppress by the circuit court in the case against Archie Moore, the appellee, who was charged by indictment with unlawfully possessing a controlled substance, to-wit, cocaine, on or about May 11, 1988, in viola *839 tion of § 13A-12-212, Code of Alabama 1975, as amended. The appellee, on the occasion of this alleged possession, was accompanied by another black male who left a certain residence in a particular Lincoln Town Car which had been described by the informant to Mobile Police Officer David Baker.
The circuit court, after conducting the hearing on the motion to suppress, granted same. The State of Alabama then perfected an appeal to this court from the granting of the motion to suppress by the trial judge, who had determined that there was insufficient probable cause to arrest the appellee and his companion. We disagree and, therefore, reverse the order of the trial court and remand this cause for trial pursuant to this opinion.
Mobile Police Officer David Baker stated that he was on patrol on May 11, 1988, when he was informed to go to the intersection of Lafayette and Center Streets in the city of Mobile. He stated that he had been with the patrol division for approximately four years and with the police department five years before the date in question.
He had received certain information through a telephone call that an informant had seen this appellee and a black male companion with certain drugs in their possession. He stated that the informant had been reliable on a number of occasions and that his information had led to arrests and successful prosecutions in municipal and district court. He stated that other cases were still pending, some of which had been bound over to the grand jury through the district court.
For the sake of clarity, we will hereinafter quote from the record in this opinion as to the information which the arresting officer had received and which led to the subsequent detention and arrest of this appellant:
“MR. DEEN: Well, let her ask then. We’re objecting to his characterizations about explicit details. That’s invading the province of the court.
“THE COURT: That’s correct.
“MR. JACKSON: Okay.
“A. I received information that led me to stopping a vehicle and making an arrest.
“Q. Okay. Now, what information, specifically, if you will, did you receive?
“A. Description of a car.
“Q. What kind of a car was it?
“THE COURT: What did this informant tell you at that time? That’s what we have to know.
“A. Yes, sir. He told me that two black male subjects were in possession of controlled substance and were about to leave a house, that he was watching them, that they were about to come out of the house and get into a Lincoln Town Car, gave me the description of the car.
“MR. PENNINGTON: Object. That’s not responsive.
“THE COURT: Yes. We have to know what he said. Was it a light tan, 1985, you know, that kind of thing; what he said, not your conclusion about what he said.
“MR. JACKSON:
“Q. Just the facts of what he told you.
' “A. Yes. Well, he told me the car was brown over light tan, Lincoln Continental, and that it was parked in the driveway. And he could see the car from where he was talking to me on the phone, and told me that one of the subjects was holding cocaine in his pocket in his pants. And I asked for a description of that subject. And he gave me a ni’ckname and a possible first name on the subject.
“Q. What was the nickname?
“A. Snuff. And he said he thought his first name was Freddie but he didn’t know his last name.
“Q. Okay. And did he give you a description of this person?
“A. Yeah. He said he had a sport shirt on that had a lot of stripes in it, dark red and blue and stuff mixed together.
“Q. Okay.
“A. And he had blue jeans on, they-were long pants, and that the drugs would be in a matchbox in his pocket, the last time he saw him inside the house, he had.
*840 “Q. Okay. And what else were you told?
“A. He described the other subject as Archie Lee. And I asked him a little bit about what Archie Lee looked like. And I said, yes, I think I know who you’re talking about. I knew Archie Lee from prior times. And he gave me a description of what Archie had on as being a sort of — all he could remember was a beige shirt. And he said Archie would be driving the car and that they were fixing to leave. He wasn’t sure which way they were going to go. And I kept asking him if they were coming out yet. And he kept trying to wait there on the phone. So I, you know, I advised the operator that I would be busy for a few minutes. And they came out. They got in the car and which, with this information and my informant being reliable in the past—
“MR. DEEN: I’ll object to him referring to the informant being reliable. That invades the province of the Court, calling for a conclusion.
“THE COURT: Sustained.
“MR. JACKSON:
“Q. Okay. What did you do at that point?
“A. He told me they were coming out of the house and told me they were backing out. And I asked him which way they were going. And he said they were coming down, coming out heading towards Lafayette off of Dr. King, which I was at Lafayette and King.
“And I hung up the phone and I got into my patrol car and stopped them. They had turned south onto Lafayette Street. And I stopped them right there at Lafayette and Center Street.
“Q. Okay. What did the car look like that you stopped?
“A. It was brown over light tan Lincoln Continental with a Louisiana temporary plate on it.
“Q. Okay. And the gentlemen — how many people were in the car?
“A. Two.
“Q. Okay. Can you describe what each of them had on when you stopped them?
“A. Yes. The subject in the passenger’s seat jumped out of the car. And I was trying to keep an eye on both of them. The subject that got out of the car, Mr. Brown, had on a striped shirt and blue jeans.
“Q. Okay. What did the other person have on?
“A. He had on sort of a dress shirt that was tan in color.
“Q. Okay. Now, the person who had the tan in color shirt on, did you recognize him?
“A. Yes, I did.
“Q. Okay. And you recognized him from your past associations with him?
“A. That’s correct.
“Q. Okay. Now, as you got the car stopped, describe what happened.
“A. Well, Mr. Brown stepped out of the car.
“Q. Where was he sitting?
“A. He was in the passenger’s, front passenger’s side.
“Q. So, the other person was behind the wheel?
“A. Yes.
“Q. Okay. So, what happened?
“A. Well, Mr. Moore stopped, and Mr. Brown got out of the car. And I radioed the tag number and my description and asked for backup, that it was a possible drug violation. And Mr. Brown kind of was doing his hand — I asked him to put his hands up on top of the car. And then I leaned in and told Mr. Moore to put his hands on the steering wheel so I could keep an eye on them.
“Q. Okay.
“A. And I remember having to tell him that again. And I had turned Mr. Brown around facing the car with his hands on top. And my backup had still yet not arrived. And I was trying to control Mr. Brown for my own safety. And I felt the front part of his, you know, top part of his body and checked for weapons and found in *841 his right front pants pocket a matchbox or what felt like a matchbox. And I pulled it out, looked in it real quick. And it did contain rock objects that looked like crack cocaine to me.
“Q. Okay.
“A. I immediately read him his rights, told Mr. Moore to keep his hands where I could see him. And I believe right at that time, my backup arrived. And I handcuffed him, walked him back to the car while my backup watched Mr. Moore.
“Q. Okay. What did you do after you put him in your car?
“A. I placed Mr. Brown in the car, shut the door, came back up to the driver’s side of the vehicle, and asked Mr. Moore to step out. And myself and my backup then read him his rights and talked briefly about his driver’s license and the ownership of the vehicle.
“Q. Okay.
“A. I inquired about that. And then I brought him back to my backup’s vehicle and had him sit down and asked him whose car it was again and, I believe, ran a check on his driver’s license.
“Q. Okay.
“A. And asked if there was any guns or ammunition in the car.
“Q. Uh-huh.
“A. Or anything he did not want me to know about, or could I search the vehicle.
"Q. Okay.
“A. And he didn’t reply. My backup had started looking, you know, into the vehicle for the contraband, which Mr. Moore was checked. Before placing him in the vehicle, patrol car, he had no controlled substance on him.
“Q. Okay.
“A. So, I looked into the vehicle on the information from the informant that they both were holding—
“MR DEEN: Excuse me, Judge. Aren’t we on what he did and not what somebody said?
“THE COURT: Ask specific questions so that they’ll have an opportunity to object.
“MR JACKSON: Okay.
"Q. And after you placed him in your backup’s car, what exactly did you do next?
“A. Okay. I looked in the vehicle and found a plastic bag in the glove compartment of the vehicle.
“Q. Okay. What was in the plastic bag?
“A. Several small plastic corners of plastic bags filled with white powder and several rock objects of crack cocaine.
“Q. Okay. What did you do at that time?
“A. I took that into my custody and secured it in my patrol car at that time along with the matchbox that I secured earlier from Mr. Brown.
“Q. Okay. Now, after you secured these items of evidence, what did you do at that point?
“A. Okay. They had both been read their rights. I called for a tow truck for the vehicle.
“Q. Okay. Now, are you going to go— and you talked to them at some point?
“A. Right.
“Q. Okay. All right. You said you read them both their rights. Do you have your card with you that you read the rights off of?
“A. I’m not sure. I don’t think I have it with me. As a matter of fact, I loaned it to an officer day before yesterday and I failed to get it back from him.
“Q. Okay. Well, do you remember what you told them at that time about their rights?
“A. Yes. I advised tham that they were under arrest.
“Q. Okay. If you would, tell the Court and record exactly what you told them as far as their rights.
“A. You have the right — or I told them they were under arrest. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to an attorney. If you cannot afford an attorney, one will *842 be provided for you before any questioning. Then I asked them if they understand the rights that I just read and if they both could read the English language, understood the English language.
“Q. What did they say?
“A. They said yes — ” (R. 21-29)
The balance of the record of the hearing goes to the statement which the appellee made at the scene following his arrest. The officer fully established both a volun-tariness predicate and a Miranda predicate in his testimony before the appellee’s statement was placed before the trial court. This is, of course, correct.
The police officer indicated that the ap-pellee wanted to know who had “snitched” on him. He asked the officer on two occasions about this. He also stated that the vehicle in which they were riding was a rental car and that he had rented it. He stated that it was not his property.
The officer told the appellee that he was under arrest for possession of cocaine and that he had found cocaine in the glove compartment. (R. 47). This was shown to the other officer at the scene.
The officer further testified that the vehicle had a Louisiana temporary tag on the back window. He stated that he took the cocaine, placed it in a brown manila envelope, and took it to the toxicology lab to have it tested. This test came back positive for cocaine.
I
The State of Alabama cites to this court the United States Supreme Court’s opinions in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and the more recent case of United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).
With reference to the definition of “probable cause,” the attorney general cites in his brief the familiar opinion of Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), with its definition of “probable cause”.
In the attorney general’s brief, several opinions of this court are also cited, dealing with exigent circumstances and the requirement of a search warrant before conducting a search, such as Jones v. State, 401 So.2d 322 (Ala.Crim.App.1981), Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973), Baker v. State, 340 So.2d 854 (Ala.Crim. App.), cert. denied, 340 So.2d 860 (Ala. 1976), and Richardson v. State, 376 So.2d 205 (Ala.Crim.App.1978), aff’d, 376 So.2d 228 (Ala.1979).
This court has carefully considered the record in this cause and the applicable legal authorities as hereinabove noted. We are clear to the conclusion that the trial court erred in granting the appellee’s motion to suppress. In view of this, the order is hereby reversed and this cause is remanded to the circuit court for trial. See Sterling v. State, 421 So.2d 1375 (Ala.Crim.App. 1982).
For the reasons shown, this cause is due to be, and it is hereby, reversed and remanded for trial.
REVERSED AND. REMANDED.
All the Judges concur.