Rockford D. Tidwell was convicted for trafficking in marijuana and sentenced to ten years' imprisonment and fined $25,000.
 I
The marijuana was seized on September 18, 1985. Arnold Mitchell, a forensic laboratory analyst for the Department of Forensic Sciences, weighed the marijuana on September 27, 1984, and reported a total gross weight 1192.2 grams. On February 11, 1985, at the defendant's request, he weighed the marijuana a second time and reported a weight of 1015 grams.
The trial judge granted the State's motion in limine prohibiting the defendant from making any reference to the second weighing. Relying on People v. Newell, 77 Ill. App.3d 577, 33 Ill.Dec. 66, 396 N.E.2d 191 (1979), "as well as other judgments to the same effect in trafficking cases tried in this circuit," the judge held that "the weight of the marijuana that is determinative is the weight at the time of the commission of the offense." We agree.
At trial, the judge refused to allow defense counsel to cross-examine Mr. Mitchell on the second weighing. At a hearing held outside the jury's presence, Mitchell explained the different weight of the marijuana on the first and second weighings as due to "[l]oss in moisture, sir, or drying, period." *Page 111 
The defendant contends that he should have been permitted to cross-examine the expert on the results of the two weighings as relevant to show (a) the accuracy of the instruments used, (b) Mr. Mitchell's credibility as an expert, and (c) the actual weight of the marijuana, which was an essential element of the offense charged. With regard to factor (c), the defendant argues that if the five percent margin for error acknowledged by Mr. Mitchell as "weight for extraneous material" is considered, the actual weight of the marijuana at the second weighing was 964.25 grams which was not in excess of the one kilo (1000 grams) required in order to make out a prima facie case of trafficking. § 20-2-80 (1)(a).
In People v. Newell, 77 Ill. App.3d 577, 33 Ill.Dec. 66, 68,396 N.E.2d 291, 293 (1979), it was stated:
 "Defendant's reliance on the reduction in the weight of the plants after they were dried and the roots removed is misplaced. . . . Furthermore, the court concluded that the State may determine the weight of the contraband based upon its condition at the time it was seized.
 "We conclude that the State is not required to process and condense the seized material to minimize the weight of the contraband and it may rely on its weight at the time it is impressed."
In Dickerson v. State, 414 So.2d 998, 1002 (Ala.Cr.App. 1982), this court reached a similar conclusion with regard to the specific holding in Newell, and held that the accused had the burden of going forward with evidence that the marijuana contained parts of the marijuana plant excluded under the statutory definition of marijuana.
We agree with Newell that the State may determine the weight of the contraband based upon its condition at the time it was seized. The trafficking statute prohibits the possession of
more than one kilo or 2.2 pounds of marijuana. § 20-2-80. It is concerned with the weight of marijuana possessed by the accused, not with the weight of the marijuana some time after it has been seized and removed from the accused's possession.
An expert witness "may be impeached by a showing of a former statement inconsistent with his present testimony." C. Gamble,McElroy's Alabama Evidence § 142.01 (1) (3rd ed. 1977). "It is generally held in this country that an expert may be cross-examined as to whether he has made mistakes in other specific instances that would tend to show a lack of expertness." McElroy's § 142.01 (4). "The trial judge has a substantial amount of discretion as to the questions he will allow to be propounded to an expert witness on cross-examination." McElroy's § 142.01 (5).
The trial judge found that the evidence of the second weighing would not be a matter of impeachment. The judge also found, and we agree, that evidence that the marijuana weighed 177.2 grams less when it was weighed a second time, which was 137 days after it had been weighed the first time, did not tend to show that the expert was inaccurate or mistaken in his weighing. In questioning Mr. Mitchell outside the jury's presence, defense counsel made no showing that the conflicting weights were the result of inaccurate scales or improper weighing procedures. In fact, defense counsel argued that it was the weight of the "dried" marijuana which should be considered in meeting the "statutory threshold for trafficking." The trial judge found that "there has been no offer at this time that the Legislature intended for this to be dried bricks of marijuana."
 II
Lauran Wilmesherr testified for the defense. She was a consultant for Forensic and Security Consultants Corporation out of Tallahassee, Florida, a consultant Mass. spectroscopist with the Mississippi State Board of Health, and a forensic scientist. Through her testimony, the defense attempted to impeach Mr. Mitchell's expert opinion that the plant material he examined was marijuana. She identified the proper procedures for weighing marijuana and the *Page 112 
methods of checking the weighing instruments for accuracy and precision. She stated that a weighing instrument can become inaccurate with frequent use if it is not "calibrated with regularity and frequency." She gave her opinion that the instruments used to weigh the marijuana should have been calibrated weekly, if not more often. The State's evidence established that the instruments were calibrated only twice monthly. The defendant argues that the accuracy of the instruments was not shown and a proper predicate was not established for the testimony regarding the weight of the marijuana.
The accuracy of the weighing device was proved. See Campbellv. State, 479 So.2d 1294, 1298, aff'd, Ex parte Campbell,479 So.2d 1299 (Ala. 1985), cert. denied, ___ U.S. ___,106 S.Ct. 573, 88 L.Ed.2d 557 (1985): "Perhaps the State should have shown by some witness whether the scales were accurate, but we are unwilling to conclude that merely because the witness was unable to say the scales were accurate `to within . . . a gram,' the scales were so inaccurate as to show that the material placed on them was three times weightier than it actually was." Although Mr. Mitchell could not state the "last time" the scales were checked for accuracy, he testified that the scales were accurate, that they were checked "once a month, frequently more sometimes," that "we make sure that the scales are functioning properly," and that in his opinion, the scales were accurate based on what he "had done" and his "observations." The trial judge properly ruled that the question of the accuracy of the scales affected the weight of the expert testimony and not its admissibility.
The fact that the defense expert gave her opinion that more frequent calibration and the keeping of calibration records for a weighing device are necessary does not prove the inaccuracy of the device. Mr. Mitchell's testimony supplied a sufficient predicate for evidence of the weight of the marijuana. See Boydv. City of Montgomery, 472 So.2d 694, 699 (Ala.Cr.App. 1985) (Results of chemical test for intoxication properly admitted where officer testified that the machine was checked once a month even though he did not know the exact dates the machine was tested).
 III
Over the defendant's objection that Investigator Charles West had not been properly qualified to give an opinion as an expert, the trial judge properly ruled that he would allow West's testimony as a lay opinion on the weight of the unstripped marijuana plant stalks.
The error, if any, in admitting Investigator West's testimony as a layman was harmless in view of the fact that he was qualified and could have been treated as an expert witness. West testified that he had fifteen years' experience in law enforcement and five years' experience in narcotics investigation. He stated that he had seen between two hundred and four hundred plots of growing marijuana, had cut, stripped, and weighed stalks of marijuana a hundred times, and was familiar with the amount of plant material that would constitute one pound. "It is clear to this court that [West] was an experienced officer in the field of narcotics and qualified to give his opinion as one `who has seen or studied marijuana'," Fleming v. State, 470 So.2d 1343, 1347
(Ala.Cr.App. 1985), cert. denied, ___ U.S. ___, 106 S.Ct. 164,88 L.Ed.2d 136 (1985) (quoting Jenkins v. State, 46 Ala. App. 719, 248 So.2d 758 (1971)).
Furthermore, the weight to which Investigator West testified was not the weight upon which defendant's conviction rested. West gave his opinion regarding the weight of the untested
marijuana which included parts of the plants which were not delivered to the toxicology laboratory. Thus, even if West's testimony was improperly admitted it was harmless because the critical weight, in excess of 2.2 pounds, was established by other testimony. A.R.A.P. 45.
 IV
The marijuana seized from defendant's property was placed in a pickup truck, *Page 113 
which was later loaded with plant material seized from two other unrelated plots and driven to a temporary storage facility. The defendant claims that because of the possibility that some of the other plant material was tangled or intertwined with the material seized from his plot the State failed to show an unbroken chain of custody of the marijuana.
Investigator West testified that he placed a stepladder between the plant material loaded at the defendant's residence and the plants from the other two plots. In addition, he stated that he could distinguish the defendant's plants because they had been cut, while the vegetation from the other two plots had been "pulled up." The plants from the last two plots were also shorter and "bushier" than those gathered from the defendant's property.
Investigator West's testimony establishes a reasonable probability that the sample of plant material tested was taken from the vegetation seized from the defendant.
 "To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." Sexton v. State, 346 So.2d 1177, 1180 (Ala.Cr.App.), cert. denied, Ex parte Sexton, 346 So.2d 1180
(Ala. 1977).
See also Lowery v. State, 452 So.2d 897, 899 (Ala.Cr.App. 1984).
The situation presented by the loading of the vegetation from defendant's property with plant material from the two other plots indicates, at most, a weak link in the chain of custody. "Where a weak link in the chain of custody is said to exist, it presents a question of the credit and weight to be accorded rather than of the evidence of the admissibility of the item."Williams v. State, 375 So.2d 1257, 1267 (Ala.Cr.App.), cert. denied, Ex parte Williams, 375 So.2d 1271 (Ala. 1979).
 V
We find that the marijuana was not the subject of an improper search and seizure. On September 18, 1984, a pilot with the Department of Public Safety observed marijuana growing in a wooded area immediately beyond the yard of a rural residence. The pilot contacted Alabama Bureau of Investigation Investigator Charles C. West and, from his airplane and by way of radio, directed West and officers of the Montgomery Sheriff's Office to Tidwell's residence and the marijuana. The officers drove up Tidwell's driveway, advised Tidwell of hisMiranda rights, and walked across his lawn to where the grass ended at a "wall" of trees, bushes, and vines. The growing marijuana plants were behind and on the other side of this tree line. Tidwell testified that the marijuana could not be seen from his back yard. Officer West testified that the "top part" of the plants could be seen through the bushes. The tree line was so thick that the officers could not get through and had to find "another way down." West testified that Tidwell "told us that the path or the way to get in was on below where we were." Some of the plants were twelve feet tall. The officers cut down and confiscated 103 plants.
In a written order, the trial judge found "that the contraband was growing beyond the curtilage of the defendant's residence and that this case falls within the `open fields' doctrine." Open fields are not covered by the Fourth Amendment because they are not included in the Amendment's explicit protection of "persons, houses, papers, and effects," and because they furnish no legitimate expectation of privacy.Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735,80 L.Ed.2d 214 (1984). Comment, Curtilage or Open Fields?: Oliverv. United States Gives Renewed Significance to the Concept ofCurtilage in Fourth Amendment Analysis, 46 U.Pitt. L.R. 795 (1985). Even if the marijuana had been growing within the curtilage of Tidwell's home, the Fourth Amendment was *Page 114 
not violated by the naked-eye aerial observation of his back yard.
 "Respondent argues that because his yard was in the curtilage of his home, no governmental aerial observation is permissible under the Fourth Amendment without a warrant. The history and genesis of the curtilage doctrine is instructive. `At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life."' Oliver [v. United States, 466 U.S. 170], at 180 [, 104 S.Ct. 1735, at 1742] (quoting Boyd v. United States, 116 U.S. 616, 630 [6 S.Ct. 524, 532] (1886)). See 4 Blackstone, Commentaries *225. The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. The claimed area here was immediately adjacent to a suburban home, surrounded by high double fences. This close nexus to the home would appear to encompass this small area within the curtilage. Accepting, as the State does, that this yard and its crop fall within the curtilage, the question remains whether naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable. That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. E.g., United States v. Knotts, 460 U.S. 276, 282 [103 S.Ct. 1081, 1085, 75 L.Ed.2d 55] (1983). `What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' Katz [v. United States, 389 U.S. 347] at 351 [88 S.Ct. 507 at 511, 19 L.Ed.2d 576].
 "The observations by Officers Shutz and Rodriquez in this case took place within public navigable airspace, see 49 U.S.C.App. § 1304, in a physically nonintrusive manner; from this point they were able to observe plants readily discernible to the naked eye as marijuana. That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant. Such observation is precisely what a judicial officer needs to provide a basis for a warrant. Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor."
". . . .
 "In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye." California v. Ciraolo [Ms. 84-1513, May 19, 1986] ___ U.S. ___, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
Here the question is whether or not the law enforcement officers violated Tidwell's Fourth Amendment rights by passing through the curtilage of his residence in order to seize, without a search warrant, the marijuana plants which were growing outside of the curtilage and which had been properly and legally observed from the air.
The "search" for and discovery of the contraband occurred from the airplane and before any law enforcement officer set foot on Tidwell's property. The officers could *Page 115 
legitimately "search" the open fields without violating any Fourth Amendment rights. Ex parte Maddox, [Ms. 84-1159, April 25, 1986] (Ala. 1986). "[I]n the open fields, the Fourth Amendment is inapplicable and . . . noncompliance with its dictates is therefore, immaterial." C. Moylan, Jr., The FourthAmendmemt Inapplicable vs. The Fourth Amendment Satisfied. TheNeglected Threshold of "So What", 77 S.Ill. U.L.J. 75, 83 (1977).
Here, no search or seizure occurred within the curtilage of Tidwell's residence. Although the officers technically trespassed in order to get to the marijuana, that trespass, which involved neither a search nor a seizure, was inconsequential for purposes of the Fourth Amendment. "Of course, a search of one's home or its curtilage, effected as a result of a trespass, is an encroachment on a person's expectancy of privacy and is for that reason, but not becauseof the trespass, a violation of the Fourth Amendment if not based on probable cause or authorized by a search warrant."United States v. Jackson, 585 F.2d 653, 660 (4th Cir. 1978). (Emphasis added.)
The Fourth Amendment protected the curtilage, yet no search or seizure occurred there. The means by which the marijuana was first discovered, the "search," and the area from which the marijuana was seized, an "open field," were not embraced within the protection of the Fourth Amendment.
In McDowell v. United States, 383 F.2d 599 (8th Cir. 1967), federal agents entered the defendant's curtilage for purposes of surveillance. Neither a search nor a seizure, however, took place within the curtilage and the federal district court denied the motion to suppress the evidence. The circuit court noted:
 "While it is well established that the protection of the Fourth Amendment extends to the curtilage, at no time was the dwelling of appellant Bryce McDowell, or the curtilage surrounding that dwelling, invaded for the purposes of a search. . . . "The only time the federal game agents were within the curtilage of the farm buildings of Mr. McDowell . . . the agents merely recorded the names of those persons coming out of the north field and visually observed their clothing. This did not constitute a search, and no seizures for the purposes of obtaining evidence took place within the curtilage." 383 F.2d at 603. (Emphasis added.) (Citations omitted.)
The rule was stated in United States v. Diaz-Segovia,457 F. Supp. 260, 270 (D.Md. 1978):
 "The rule of law that the Court draws from the above cases is that agents are allowed to trespass upon individual's property as long as they do not search the house or curtilage and do not physically enter or peer into enclosed buildings, vehicles, or the like. An agent may observe activity from a vantage point which may be upon a defendant's property, if such observation is made across `open fields' from an area sufficiently removed from the dwelling to prevent unauthorized surveillance inside the house. If the agent, through his observations, develops probable cause to believe that a crime is being committed, he may further enter the property in order to effect an arrest. However, he must obtain a search warrant in order to enter and search any building, vehicle, etc. which hides items sheltered from public view."
No violation of the Fourth Amendment occurred in the present case. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 688