[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1045 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1046 
The appellant, Roger Wayne Doggett, Jr., was convicted of the unlawful possession of marijuana, a violation of § 13A-12-213, Ala. Code 1975. He was sentenced to five years' imprisonment; that sentence was suspended, and he was placed on five years' of formal probation, and was ordered to pay court costs and fines.
 I.
Doggett contends that the Alabama National Guard violated the Fourth Amendment to the United States Constitution by participating in events that led to his arrest. Specifically, he argues that National Guard personnel and equipment, maintained by the federal government, were illegally used to assist in a state law-enforcement operation. At trial, he moved to suppress the evidence — marijuana plants — on this basis. The trial court denied that motion. This issue is a question of first impression in Alabama.
In United States v. Hutchings, 127 F.3d 1255 (10th Cir. 1997), the United States Court of Appeals for the Tenth Circuit entertained a claim similar to the one presented by Doggett, except that in Hutchings, the Utah National Guard accompanied local law enforcement on a ground search for marijuana (in this case, the marijuana plants were observed by a national guardsman during aerial surveillance). In describing the unique position occupied by members of the National Guard, that Court stated:
 "The dispositive question here is whether the officers were `any part of the Army or Air Force' during the activities at White River. A brief explanation of the National Guard's complex structure is necessary to explain why they were not. The National Guard occupies a unique place in our federal system of government; it has been described appropriately as a `hybrid' body. See Tirado-Acosta v. Puerto Rico National Guard, 118 F.3d 852, 853 (1st Cir. 1997). All reservists who enlist in a state's National Guard simultaneously enlist in the National Guard of the United States. See Perpich v. Dept. of Defense, 496 U.S. 334, 345, 110 S.Ct. 2418, 2425, 110 L.Ed.2d 312 (1990). By enlisting with the United States, the Guardsmen become part of the Army's reserve force; they are not on active duty with the Army. See id.; see also 10 U.S.C. § 101(d)(1) (noting, in definition of `active duty' in U.S. military, that such duty `does not include full-time National Guard duty'). Guardsmen do not become part of the Army itself until such time as they may be ordered into active federal duty by an official acting under a grant of statutory authority from Congress. See, e.g., Perpich, 496 U.S. at 343-44, 110 S.Ct. at 2424-25
(discussing statutes that have authorized the President to draft the National Guard into federal service); 10 U.S.C. § 12301 (formerly codified at 10 U.S.C. § 672) (authorizing the Secretary of the Army, Navy, or Air Force (or his designee) to call the National Guard into federal service in time of war or national emergency). When that triggering event occurs, a Guardsman becomes a part of the Army and loses his status as a state *Page 1047 
serviceman. See 32 U.S.C. § 325(a); Perpich, 496 U.S. at 348, 110 S.Ct. at 2426-27. But until a Guardsman receives orders directing him into federal service, he is a state serviceman, and not part of the federal Army."
127 F.3d at 1257.
In the instant case, we agree with the trial court that the Alabama National Guard units employed in this drug eradication program were not acting in their federal capacity when they were conducting surveillance on Doggett's residence. Maj. Daniel Norman testified that he serves in a joint supervisory position as the counterdrug coordinator and the state aviation officer for the Alabama Army National Guard. (R. 95.) Maj. Norman stated that his commanding officer is the commander of Reconnaissance and Interdiction (RAID), a state program, stationed in Montgomery. Maj. Norman stated that the RAID program falls under the authority of the Alabama National Guard. The head of the National Guard, Brigadier Willie Alexander, serves as the adjutant general. Maj. Norman testified that the adjutant general falls under the command of the Governor of the State of Alabama and that the Alabama National Guard is a state entity. (R. 96.) He testified that RAID, established by the United States Congress and implemented through the secretary of defense and the federal government, exists to provide aerial law-enforcement support to federal, state, and local law-enforcement agencies. (R. 97.) He further explained:
 "In the State of Alabama, there are about a dozen authorized missions from the Department of Defense that a National Guard counterdrug program can conduct. Of those, the Governor of the state and the Attorney General have to certify that none of those missions violate any state laws or statutes. That certification from the Governor and the Attorney General of this state are due annually to the Secretary of Defense.
 "We operate under Title 32 of the U.S. Code, not Title 10, . . . . [Payment checks issued to members of the National Guard] come from the federal government. We are Title 32. We are paid by the government, but we work for the State of Alabama."
(R. 99-100.) Maj. Norman further testified that 32 U.S.C. § 112
authorizes the National Guard to participate in counterdrug support for local law-enforcement agencies. (R. 101). Testimony indicated that Attorney General Jeff Sessions approved the implementation of the RAID program.
Chief Warrant Officer Randolph G. Wilson testified that he is currently on active duty with the Alabama National Guard, having been activated by the Governor of the State of Alabama as a helicopter pilot to provide assistance to federal, state, and local law-enforcement agencies pursuant to the RAID program. (R. 6-8.) On the date in question, he provided aerial support for marijuana eradication to Alabama state troopers in Mobile County. (R. 9.) Chief Wilson testified that the helicopter he was piloting was provided and equipped by the United States Department of Defense (R. 25.) His commander in the National Guard gave Chief Wilson his assignment in the drug-eradication program. (R. 48-49.) Chief Wilson testified that during the incident in question, he was released from circling and observing the activities at Doggett's house by State Trooper Corp. John Guthrie when it became apparent that the ground troops no longer needed support. (R. 51-53, 63.)
In addressing the propriety of the participation of the Alabama National Guard in the RAID program, the trial court stated: *Page 1048 
 "First, the National Guard Mutual Assistance Counter-Drug [Activities] Compact Law, § 31-11-1 et seq., Code of Alabama (1975), authorizes the activity at issue in the instant case. Article II expressly states:
 "`The purpose of this compact is to provide the following:
"`. . . .
 "`2. Permit the National Guard of this state to enter into mutual assistance and support agreements, on the basis of need, with one or more law enforcement agencies operating within this state, for activities within this state, or with a National Guard of other states, whether the activities are within or without this state. . .'
"Second, § 31-2-28 of the Code provides as follows:
 "`The armed forces of the state ordered into service of the state for the enforcement of law . . . shall be deemed to be in the active military or naval service of the state.'
 "Third, the supplemental exhibits establish that state authorities have satisfied the statutory mandates of 32 U.S.C. § 112, which provides funding for state drug interdiction and counter drug activities by `personnel of the State National Guard used, while not in federal service, for the purpose of drug interdiction and counter drug activities.'
 "Though this seems to be an issue of first impression in Alabama, other jurisdictions have followed this rationale.
 "In [United States] v. Benish, 5 F.3d 20 (3d Cir. 1993), a case which also involved the use of State National Guard personnel to assist civilian law enforcement, the appellate court held that use of State National Guard did not violate federal law where a state statute authorized the Governor to deploy National Guard troops to support drug interdiction programs. Since § 31-11-1, et seq., Code of Alabama (1975) provides our Governor the same authority, this decision is of significant precedential value."
(C.R. 148-50) (emphasis added.)
We agree with the trial court that based upon the testimony presented during the suppression hearing, the evidence indicated that in acting pursuant to the State of Alabama's drug eradication program — RAID — the Alabama Army National Guard acted under authority of the state — not the federal — government. Despite the fact that the personnel and equipment at issue in this case are associated with the federal government, the evidence indicated that at the time of this particular incident, the Alabama Army National Guard was not federalized and, thus, that body retained its state status. Although the initial order to participate in RAID was given by a member of the National Guard, at all times pertinent to this action, Chief Wilson, as a state guardsman, acted under the directives of the State of Alabama as they were implemented by the Alabama Department of Public Safety and the Alabama state troopers. Cf. Hutchings, supra.
Moreover, because the Alabama National Guard was acting pursuant to state authority when it conducted the drug eradication operations, that unit and its actions fall under an exception to the Posse Comitatus Act, upon which Doggett relies. The United States Court of Appeals for the Sixth Circuit accurately summarized the law regarding the Posse Comitatus Act and the members of the National Guard in Gilbert v. United States,165 F.3d 470 (6th Cir. 1999):
 "In August, 1990, members of an anti-drug task force conducting aerial surveillance observed marijuana being *Page 1049 
grown within the boundaries of the Daniel Boone National Forest. A nearby drying area for harvested marijuana plants was also observed in the vicinity. On September 4, 1990, further surveillance disclosed marijuana hanging in the drying area.
 "As a result of these observations, a team of officers from the United States Forest Service, Kentucky State Police, Kentucky Attorney General's Office, and Kentucky National Guard conducted ground surveillance of the area. The National Guardsmen were armed with sidearms and automatic weapons. On the third day of surveillance, officers saw [one of the appellants] remove buds from marijuana plants and place the buds in a bag. [This appellant] headed toward the drying area. The National Guard officers `assumed a tactical position for purposes of surveillance.' (Tr at 84; JA at 237).
" . . . .
 "The trial evidence included testimony by Guardsmen, identification of the appellants based on their surveillance, marijuana, garbage bags, the pocketknives, copper wire, hunting packs, the seized firearms and ammunition, [the second appellant's] statements, and photographs. All this evidence was discovered, seized, or otherwise obtained, in part, by members of the Kentucky National Guard who were at the scene.
 "The Posse Comitatus Act, on which appellants base their claim that the arrests and ensuing seizure of their belongings and acquisition of [the second appellant's] statement were unlawful, provides:
 "`Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.'
"18 U.S.C. § 1385.
 "The purpose of this statute is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws. Congress adopted the Act's precursor in 1878 in response to abuses resulting from such use in former Confederate States after the Civil War. See generally United States v. Hartley, 486 F. Supp. 1348, 1356 (M.D.Fla. 1980). The Act reflects a concern, which antedates the Revolution, about the dangers to individual freedom and liberty posed by use of a standing army to keep civil peace. See David E. Engdahl, Soldiers, Riots and Revolution: The Law and History of Military Troops in Civil Disorders, 57 Iowa L.Rev. 1 (1971).
 "By its own terms, the Act applies to the Army and Air Force. United States v. Yunis, 924 F.2d 1086, 1093 (D.C. Cir. 1991) (Act inapplicable to the Navy); Schowengerdt v. General Dynamics Corp., 823 F.2d 1328, 1340 (9th Cir. 1987) (same). See also United States v. Roberts, 779 F.2d 565, 567 (9th Cir. 1986) (Act extended by Executive Order to include the Navy).
 "The Act does not apply to members of the National Guard unless they have been called into `federal service.' Until called into such service, members of the National Guard remain state, rather than federal officers. Perpich v. Dep't of Defense, [supra] (`unless and until ordered to active duty in the Army, [Guardsmen] retained their status as members of a separate State Guard unit'). Thus, `[e]xcept when employed in the service of the United States, officers of the National Guard continue to be officers of the state and not officers of *Page 1050 
the United States or of the Military Establishment of the United States.' United States [ex rel. Gillett] v. Dern, 74 F.2d 485, 487 (1934). `Guardsmen do not become part of the Army itself,' as pointed out in United States v. Hutchings, [supra, at] 1258 , `until such time as they may be ordered into active federal duty by an official acting under a grant of statutory authority from Congress.' Only when `that triggering event occurs [does] a Guardsman become a part of the Army and lose his status as a state serviceman.' Id. See generally, Steven B. Rich, The National Guard, Drug Interdiction and Counterdrug Activities and Posse Comitatus: The Meaning and Implications of `in Federal Service,' 1994 Army Law. 16.
 "The record in this case shows conclusively that the National Guardsmen who participated in appellants' arrests and ensuing searches and seizures were in state, rather than federal service when they did so. Aside from the complete absence of any proof that the Guardsmen had been called into active service with the Army, see id. at 18 (noting limited and specific ways in which Guardsmen may enter active duty), the record contains ample evidence that the Guardsmen were acting in response to directives issued by their Commander-in-Chief, the Governor of Kentucky.
 "The Governor issued an executive order creating a Marijuana Strike Force. (JA 116). The Strike Force's objective was `total eradication of marijuana in [the] Commonwealth.' (Id. 117). Command of the Strike Force was delegated to a ten member committee; one of whose members was an officer with the National Guard's Department of Military Affairs. (Id. 116). Although federal officials were also members of the Strike Force and its governing committee, those officials were from civilian agencies, rather than the United States Army. The Guardsmen assigned to the Strike Force were unquestionably under state, rather than federal control.
 "Notwithstanding this proof of the Guardsmen's status, appellants contend that, because the Guardsmen were serving in a full-time capacity and were being compensated with federal, rather than state funds, they were `in federal service' and acting as members of the United States Army. These circumstances are immaterial: `[t]he issue of status depends on command and control and not on whether: state or federal benefits apply; state or federal funds are being used; the authority for the duty lies in state or federal law; or any combination thereof.' Rich, supra, at 19. `Although National Guard members receive federal pay and allowances . . . while performing full-time National Guard Duty,' they remain members of the state National Guard and not members on active duty in federal service with the United States Army. Id. Consequently, the Act, which applies only to members of the federal armed services, does not apply to the Guardsmen in this case.
 "Similarly, the fact that the Guardsmen looked and acted like soldiers, rather than law enforcement officers, is immaterial. `These indicia, however persuasive they may be to the eye,' the court noted in Hutchings, 127 F.3d at 1258, `have never determined the character of a Guardsman's service. . . . [T]hat question depends solely on whether command of the Guardsman has been taken away from a state's governor by one authorized to do so by Congress.' In this case, as in Hutchings, command remained with the state. *Page 1051 
 "Alternatively, the circumstances under which the Guardsmen were acting in this case were, as permitted by the terms of the Act, authorized by an Act of Congress. Pursuant to 32 U.S.C. § 112(b), full-time National Guardsmen may be used for the `purpose of carrying out drug interdiction and counter-drug activities.' Use by the Commonwealth of Kentucky of its Guardsmen in accordance with this federal statute provides another basis for exempting those officers from the Posse Comitatus Act.
 "We conclude, accordingly, that officers of the Kentucky National Guard did not violate the Posse Comitatus Act when they participated in the surveillance of appellants' marijuana cultivation and harvesting, arrested them for those unlawful activities, and searched them and the area in which they had been growing their contraband crop.[FN2]
 "FN2. We need not reach the issue of whether, had we found the Act to have been violated, suppression should have occurred. We note, however, that every federal court to have considered the issue has held that suppression is not an appropriate remedy for a violation of the Act. United States v. Al-Talib, 55 F.3d 923, 930 (4th Cir. 1993); Hayes v. Hawes, 921 F.2d 100, 103 (7th Cir. 1990); United States v. Hartley, 796 F.2d 112, 115 (5th Cir. 1986). Accord, United States v. Griley, 814 F.2d 967, 976
(4th Cir. 1987); United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979); United States v. Walden, 490 F.2d 372, 376-77 (4th Cir. 1974). See also Note, The Posse Comitatus Act as an Exclusionary Rule: Is the Criminal to go Free Because the Soldier Has Blundered?, 61 N.D. L.Rev. 107, 129 (1985) (`There is no evidence Congress intended the Posse Comitatus Act to double as an exclusionary rule')."
Gilbert, 165 F.3d at 472-74. We agree with the well-reasoned analysis in Gilbert and we adopt it as our own.
The Gilbert decision should also be noted for its refutation of the argument that because National Guardsmen are paid by the United States Department of Defense, they are federal troops. Doggett, in the instant case, also raises this contention, and we likewise conclude that it is without merit. The United States Court of Appeals for the Tenth Circuit, in Hutchings, commented:
 "It would, in fact, be a rare situation in which a Guardsman enforced drug laws and was not serving the state. Under federal funding laws which allow the National Guards to participate in programs such as Operation Greenleaf [the Utah drug eradication program], the National Guards forfeit their federal support if any Guardsmen employed in an anti-drug effort are in federal service. See 32 U.S.C. § 112(a)(1) (granting funds for use of National Guardsman in anti-drug efforts `while not in federal service'). That condition was, in fact, likely added to ensure that the federal funding of counter-drug activities did not lead to abuse of the Posse Comitatus Act. Tirado-Acosta [v. Puerto Rico National Guard], 118 F.3d [852] at 853 [(1st Cir. 1997)].
 "It is possible, however, that a Guardsman who had been called into federal service — that is, one who was wearing his federal `hat' — could be wrongfully employed in a domestic anti-drug campaign. In the instant case, however, the district court found in accordance with the undisputed evidence that the Guardsmen were in state service for the entire duration of the drug interdiction efforts at White River on August 10-12, including the time of the *Page 1052 
Hutchings' arrest and the whack-and-stack operation. United States v. Hutchings, No. 93-CR-214G (D.Utah Dec. 11, 1995). Lt. Col. Watts [of the Utah National Guard] specifically instructed the involved Guardsmen that they were under the direction of the Governor of Utah during this time. Id. More importantly, the orders themselves indicated a `Title 32 Duty Status,' demonstrating that the Guardsmen's assignment to White River was a state-controlled, not a federal, assignment. Id. We adhere to the district court's conclusions and find no violation of the [Posse Comitatus Act]."
Hutchings, 127 F.3d at 1257-59 (footnotes omitted.) Thus, as the Sixth Circuit Court of Appeals made abundantly clear in Gilbert, a state's use of the National Guard in drug-eradication programs, assuming that that unit is not federalized at the time and that the program is authorized by the state's governor and approved by the attorney general, provides an exception to the Posse Comitatus Act that is "expressly authorized by the Constitution or Act of Congress." See Gilbert, supra, quoting 18 U.S.C. § 1385; see also 32 U.S.C. § 112. We agree with the trial court that in light of the fact that the evidence presented at the hearing indicates that at the time the surveillance was conducted, this unit of the Alabama Army National Guard was not federalized and that its activities had been ratified by the governor and the attorney general of the State of Alabama, Chief Wilson's activities were lawful as those authorized by the State of Alabama. Therefore, the Posse Comitatus Act does not apply in this instance, and Doggett's suppression motion was properly denied in this regard.
 II.
Doggett contends that the Alabama state troopers conducted their operations in an illegal manner. Specifically, he argues that the troopers:
 a. Did not have probable cause or a search warrant to conduct aerial surveillance over his house;
 b. Violated Federal Aviation Administration regulations in that they used helicopters to hover over his house at an altitude of 300 feet or less;
c. Illegally landed a helicopter on nearby property;
d. Illegally arrested him without a valid warrant; and,
e. Illegally entered his home without a valid warrant.
 a. Probable Cause
Doggett claims that the state troopers did not have probable cause to believe he was involved in criminal activity to justify the aerial surveillance of his property. Chief Wilson testified that before the incident in question, he had no specific information that would have led him to believe that Doggett was engaged in any wrongdoing. (R. 38.) In Tidwell v. State,496 So.2d 109 (Ala.Crim.App. 1986), this Court addressed a similar claim involving aerial surveillance conducted by the Alabama Department of Public Safety. Although Tidwell dealt specifically with marijuana being grown in an area immediately outside of a private yard, our analysis concerning aerial surveillance extends to areas located inside yards, as well.
 "Open fields are not covered by the Fourth Amendment because they are not included in the Amendment's explicit protection of `persons, houses, papers, and effects,' and because they furnish no legitimate expectation of privacy. Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214
(1984). Comment, Curtilage or Open Fields?: Oliver v. United States Gives Renewed Significance *Page 1053 to the Concept of Curtilage in Fourth Amendment Analysis, 46 U.Pitt.L.R. 795 (1985). Even if the marijuana had been growing within the curtilage of Tidwell's home, the Fourth Amendment was not violated by the naked-eye aerial observation of his back yard. Respondent argues that because his yard was in the curtilage of his home, no governmental aerial observation is permissible under the Fourth Amendment without a warrant. The history and genesis of the curtilage doctrine is instructive. `At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life."' Oliver [v. United States, 466 U.S. 170], at 180 [, 104 S.Ct. 1735, at 1742] (quoting Boyd v. United States, 116 U.S. 616, 630
[6 S.Ct. 524, 532, 29 L.Ed. 746] (1886). See 4 Blackstone, Commentaries 225. The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. The claimed area here was immediately adjacent to a suburban home, surrounded by high double fences. This close nexus to the home would appear to encompass this small area within the curtilage. Accepting, as the State does, that this yard and its crop fall within the curtilage, the question remains whether naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable. That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. E.g., United States v. Knotts, 460 U.S. 276, 282 [103 S.Ct. 1081, 1085, 75 L.Ed.2d 55] (1983). `What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' Katz [v. United States, 389 U.S. 347] at 351 [88 S.Ct. 507 at 511, 19 L.Ed.2d 576
(1967)].
 "`The observations by Officers Shutz and Rodriquez in this case took place within public navigable airspace, see 49 U.S.C.App. § 1304, in a physically nonintrusive manner; from this point they were able to observe plants readily discernible to the naked eye as marijuana. That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant. Such observation is precisely what a judicial officer needs to provide a basis for a warrant.
 "`Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor.'
"'. . . .
 "`In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally *Page 1054 
protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye.' California v. Ciraolo
[Ms. 84-1513, May 19, 1986] 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
" . . . .
 "The `search' for and discovery of the contraband occurred from the airplane and before any law enforcement officer set foot on Tidwell's property. The officers could legitimately `search' the open fields without violating any Fourth Amendment rights. Ex parte Maddox, [Ms. 84-1159, April 25, 1986] (Ala. 1986). `[I]n the open fields, the Fourth Amendment is inapplicable and . . . noncompliance with its dictates is therefore, immaterial.' C. Moylan, Jr., The Fourth Amendment Inapplicable vs. The Fourth Amendment Satisfied: The Neglected Threshold of `So What', 77 S.Ill.U.L.J. 75, 83 (1977).
" . . . .
 "The Fourth Amendment protected the curtilage, yet no search or seizure occurred there. The means by which the marijuana was first discovered, the `search,' and the area from which the marijuana was seized, an `open field,' were not embraced within the protection of the Fourth Amendment."
Tidwell, 496 So.2d at 113-15 (emphasis added). Although the location in which the marijuana was found in Tidwell was even less protected from Fourth Amendment scrutiny than that in the instant case, our decision in Tidwell makes it clear that even had the marijuana been grown within the sacred curtilage of Tidwell's home, the mere location of these plants would not offer protection from what the naked eye could readily see. See Tidwell, supra.
Applying the precepts of Tidwell to the instant case and recognizing our conclusion that the surveillance conducted by the National Guard was legal, we agree with the trial court that despite the fact that the plants at issue were being grown inside the appellant's fenced yard, Fourth Amendment privacy protections do not apply to items readily observable to the public eye. Thus, specific probable cause relating to this particular appellant in order to conduct at-large aerial surveillance was not required.
 b. The Altitude of the Helicopters
In Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693,102 L.Ed.2d 835 (1989), the Supreme Court of the United States, addressing the operation of aircraft in aerial surveillance, stated:
 "Nor on the facts before us, does it make a difference for Fourth Amendment purposes that the helicopter was flying at 400 feet when the officer saw what was growing in the greenhouse through the partially open roof and sides of the structure. We would have a different case if flying at that altitude had been contrary to law or regulation. But helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft.[FN3] Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse. The police officer did no more. This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law. But it is of obvious importance that the helicopter in this case was not violating the law, and there is nothing in the *Page 1055 record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude. Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage. As far as this record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment.
 "FN3. While Federal Aviation Administration regulations permit fixed-wing-aircraft to be operated at an altitude of 1,000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other than congested areas, helicopters may be operated at less than the minimums for fixed-wing-aircraft `if the operation is conducted without hazard to persons or property on the surface. In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the [Federal Aviation Administration] Administrator.' 14 C.F.R. § 91.79 (1988)."
488 U.S. at 450-52 (emphasis added.) Additionally, in footnote 2 in Scott v. United States, 13 F. Supp.2d 1226 (M.D.Ala. 1998), that Court observed that
 "although Scott has alleged that his property was located in a congested area, Scott has not offered any supporting evidence. . . . Over sparsely populated areas, there is no altitude restriction. . . . Helicopters have no altitude restrictions at all provided they operate without hazard to persons or property on the surface. [14 C.F.R] at § 91.119(d)."
13 F. Supp.2d at 1231. Furthermore, in his dissenting opinion inCalifornia v. Sabo, 481 U.S. 1058, 107 S.Ct. 2200, 2201,95 L.Ed.2d 855 (1987), Justice White observed that hazardous operation of helicopters could include "interminable hovering, raising clouds of dust, [and] creating unreasonable noise"; however, he concluded that such factors, in that case, were not shown by the evidence. 107 S.Ct. at 2201.
In the instant case, Chief Wilson testified that when he first saw the marijuana in Doggett's backyard, he was flying at an altitude of about 600 or 700 feet, approximately the same altitude at which he had been flying all day. (R. 36.) Upon spotting the marijuana plants, Chief Wilson lowered his helicopter to an altitude of about 300 feet, verified that the vegetation was marijuana plants, and circled Doggett's residence for about 20 minutes while he notified local law enforcement of his discovery and waited on them to arrive. (R. 37-38, 40-41.)
Trooper John Clark, a pilot for the state troopers, testified that he responded to Chief Wilson's call, and that, upon reaching Doggett's house, he flew his helicopter to a lower altitude and circled the residence in an attempt to identify, for himself, the plant material. He stated that when he reached Doggett's house, Chief Wilson raised his altitude to about 500 feet and that he descended to an altitude that allowed the two helicopters to have "a couple of hundred feet [of] separation" between them. (R. 57-58.)
As stated in Riley, helicopters may be operated at an altitude of less than 500 feet so long as they are operated without creating a hazard to persons or property on the surface and so long as they comply with the routes or altitudes specifically prescribed by the Federal Aviation Administration. *Page 1056 488 U.S. at 452; see also 14 Code of Federal Regulations §§ 91.79 and 91.119(d) (1988). Thus, even when Chief Wilson operated his helicopter at roughly 300 feet in order to better observe the questioned plant material and Trooper Clark descended to a level "a couple of hundred feet" below the 500-foot altitude later maintained by Chief Wilson, as long as they both operated their aircraft without hazard and they complied with the routes and altitudes assigned to them, no laws were violated and no regulations breached. The only allegations of harm that these helicopters allegedly inflicted on Doggett and his property are based upon speculation. While Doggett's counsel implies that the helicopters caused a lot of noise, created wind, and disturbed people in their normal activity, the record does not support such a finding. Indeed, Doggett's actions of uprooting the plants, running back-and-forth to his house, starting a fire, and driving his riding lawn mower over the plants indicate that the hovering and circling of the helicopters did not create a danger to individuals in the neighborhood. The appellant has not proven any of these contentions of harm and violations of regulations. Thus, we reject this claim.
 c. Landing the Helicopter
Doggett argues that law-enforcement officers acted illegally in landing a helicopter on someone else's private property located next to his own, entering onto his private property, and then arresting him.
Doggett lacks standing to challenge Trooper Clark's landing the helicopter onto another's property. "Whether a person has standing to contest the constitutionality of a search and seizure depends on whether that person has a reasonable expectation of privacy in the item(s) searched and/or seized." Peoples v. State,510 So.2d 554, 568 (Ala.Cr.App. 1986). Doggett has made no showing in the record before us that he had any claim of right to the field upon which Trooper Clark landed his aircraft. "This [C]ourt cannot predicate error on matters not shown by the record, nor can we presume error from a silent record." Stegall v. State,628 So.2d 1006, 1009 (Ala.Crim.App. 1993). Having shown this Court no property interest in that field, Doggett certainly cannot claim any reasonable expectation of privacy or Fourth Amendment privilege concerning that tract of land. See Peoples, supra.
 d. Alleged Illegal Arrest
The appellant contends that the law-enforcement officers illegally arrested him because, he said, they effectuated the arrest without a valid warrant.
Trooper Clark testified that upon recognizing that the plant material in Doggett's yard was marijuana and observing several buckets of marijuana plants that appeared to be hastily overturned, marijuana plants freshly-pulled from the ground, and Doggett running across the yard and dropping packages on a fire, he landed his helicopter in a large field in the back of a residence located next to and within sight of Doggett's house. (R. 57-59.) Trooper Clark testified that he instinctively thought that Doggett was trying to destroy the marijuana. This impression was furthered by Trooper Clark's observance of Doggett, who jumped on a lawn mower and used the machine to run over the uprooted marijuana plants. Trooper Clark felt that an immediate interdiction was the only action to prevent Doggett from destroying any additional evidence. Trooper Clark and his partner, Corp. Danny Coone, got out of the aircraft, ran across the field to Doggett's property, and opened and entered a gate onto the property. Doggett then stopped driving the machine over the plants and attempted to flee the scene on *Page 1057 
the lawn mower. Trooper Clark pursued Doggett on foot, and eventually seized him. The ground troops, including Corp. John Guthrie and Detective Eddie Blackwell of the Mobile County Sheriff's Office, appeared and took custody of Doggett while Corp. Coone and Trooper Clark informed them about this incident. (R. 61-62.)
Doggett's conduct in attempting to uproot, burn, cut and otherwise dispose of the marijuana plants clearly supplied the troopers probable cause to believe that Doggett was engaged in the criminal activity of growing marijuana. Thus, they were justified in entering onto Doggett's land to investigate their suspicions. Their immediate entrance onto Doggett's private property was justified by the exigent circumstances created by Doggett's actions in attempting to destroy the marijuana plants.
Concerning the level of probable cause necessary to effectuate a warrantless arrest, this Court stated in Walters v.State, 585 So.2d 206 (Ala.Crim.App. 1991):
 "`"A warrantless arrest is justifiable, and will be valid if the officer had reasonable or probable cause to effect the arrest at the time that it was made." Foy v. State, 387 So.2d 321, 324 (Ala.Crim.App. 1980).'
 "`"In determining whether there was probable cause to arrest, it is not necessary that the officer have before him evidence which would support a conviction for the offense. He must have facts and circumstances within his knowledge which are reasonably trustworthy and which would lead a prudent man to believe that the suspect had committed or was committing an offense." Foy at 324 (quoting Braxton v. State, 350 So.2d 753, 756
(Ala.Crim.App. 1977). "Probable cause must be judged not with clinical detachment but with a common sense view to the realities of normal life." Musgrove v. State, 519 So.2d 565 (Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611
(1988).'"
585 So.2d at 209. As we further stated in State v. Mathews,597 So.2d 235 (Ala.Crim.App. 1992):
 "In making a determination as to whether probable cause to arrest exists, `it is simply necessary that there exist a probability that a crime has been committed and that the person to be arrested committed it.' W. LaFave, supra, at § 3.7. See also W. LaFave, 1 Search and Seizure, § 3.1(b) (2d ed. 1987).
 "`It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . ., though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause — evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] . . . [([U.S.Mich.,] 1925)] — must be measured by the facts of the particular case.'
 "Wong Sun v. United States, 371 U.S. 471, 479-80, 83 S.Ct. 407, 412-13, 9 L.Ed.2d 441 ([U.S.Cal.,] 1963)."
597 So.2d at 237-38. Any level of probable cause the troopers had formulated concerning Doggett based upon his actions as viewed by law enforcement during the aerial surveillance was further heightened by his subsequent actions — including his attempt to flee on the lawn mower and, in the words of Trooper Clark, Doggett's readiness to strike Trooper Clark — when confronted by state troopers. It is well settled that flight at the approach of law-enforcement *Page 1058 
officers is a strong indicator of mens rea, which may serve as the basis for suspecting criminal activity. Dixon v. State,588 So.2d 903, 906 (Ala. 1991); Molina v. State, 533 So.2d 701,707 (Ala.Crim.App. 1988), cert. denied, 489 U.S. 1086,109 S.Ct. 1547, 103 L.Ed.2d 851 (1989). See Sibron v. New York,392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). See also 2 W. LaFave, Search and Seizure § 3.6(e) (3d ed. 1996). The totality of all the evidence — including the aerial observation of marijuana plants growing in Doggett's yard, the observation of Doggett's attempts to destroy the plants, and his subsequent flight from law enforcement — clearly provided the state troopers and the Mobile County Sheriff's Department ample probable cause to arrest Doggett on suspicion of growing marijuana.
 e. The Alleged Warrantless Entrance into Doggett's House
Doggett further argues that law-enforcement officers unlawfully entered his home and conducted an illegal search of his residence, because, when the officers first entered the dwelling, no search warrant had yet been issued. The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. Searches performed without a warrant are presumed to be unreasonable, unless the search falls under an exception to the warrant requirement. See Katz v. United States, 389 U.S. 347,88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
Based on the evidence presented, we agree with the trial court that law-enforcement personnel were justified in entering Doggett's home. One of the recognized exceptions for a warrantless entry is the need to conduct a protective sweep.
 "`In some situations, the "potentiality for danger surrounding the arrest" may be so high that entry of premises to make a "protective sweep" will be permissible even though the arrest itself was achieved without entry. Typically, the reason no entry was made to arrest is because the police perceived the situation as a very dangerous one and thus took steps to cause the prospective arrestee to exit the premises and submit to arrest outside. Even with that person now in custody, the police may have good reason to doubt whether they can withdraw from the area with their prisoner without being fired upon, in which case an entry and "protective sweep" is justified. Such entries have been upheld when a weapon used in a recent crime by the arrestee or a weapon used by someone in firing at the police from those premises is as yet unaccounted for, and also when police have information the defendant was traveling with armed associates or that the defendant was armed and accompanied by another.'
"2 LaFave 431 (emphasis added)."
Owen v. State, 418 So.2d 214, 221-22 (Ala.Crim.App. 1982), rev'd on other grounds, 849 F.2d 536 (11th Cir. 1988); see also Owen v.State, 586 So.2d 958 (Ala.Crim.App. 1990), rev'd on other grounds,586 So.2d 963 (Ala. 1991), overruled on other grounds, Witherspoonv. State, 956 So.2d 617 (Ala.Crim.App. 1991).
In the instant case, Trooper Clark testified that he saw what appeared to be marijuana lying on the back porch of Doggett's residence and he noticed that the back door to the house was open. Trooper Clark stated that he was concerned that someone else might be in the house, so he and Corp. Coone stayed with Doggett in the yard and watched the door to make sure that no one else came out of the house. The ground troops, including Corp. Guthrie and Det. Blackwell, appeared and took custody of Doggett while *Page 1059 
Corp. Coone and Trooper Clark informed them about what they had seen. (R. 61-62.)
Det. Blackwell testified that when he arrived on the scene, he was shown various pieces of marijuana evidence by Corp. Coone and Trooper Clark and he then handcuffed Doggett, who was still in the backyard. (R. 73.) After Det. Blackwell advised Doggett of his Miranda rights, Det. Blackwell asked if there were any other people or any other evidence inside the house; Doggett exercised his right to remain silent and asserted his right to an attorney. (R. 74.) Det. Blackwell stated that he was mainly afraid that someone else was in the house who could pose a risk of harm to the law-enforcement personnel there. (R. 75.) In order to secure the residence, several officers entered the house to make sure that no one else was inside, that there were no weapons in the house, or that no evidence was being destroyed. Det. Blackwell stated that after the scene was secured, he immediately left to get a warrant to search the residence. (R. 76.)
Given the circumstances attested to by Trooper Clark and Detective Blackwell, i.e., that it was unknown whether other people were inside the house, Trooper Clark and Det. Blackwell's perceptions that a danger could have existed for law-enforcement personnel were not unreasonable. Thus, we agree with the trial court that law-enforcement officers were justified in entering Doggett's residence — even without a warrant — in order to make a cursory protective sweep of the premises to ensure against the occurrence of these dangers. See Hutchings, supra, citing Mains v.State, 375 So.2d 1299 (Ala.Crim.App. 1979).
We note that the record before us does not indicate that any premature search of Doggett's house was conducted. Det. Blackwell stated that as far as he knew, no previous search, before the execution of the search warrant, took place at Doggett's residence. (R. 82.) He testified that nothing — not "even the stuff in the yard" — was seized until he returned to execute the search warrant. Thus, the determination that no improper warrantless search of the premises was conducted is further solidified by the fact that law-enforcement personnel did not improperly or prematurely examine or seize any evidence; thus, there is no evidence to be suppressed as a result of this allegedly improper exercise. See Hutchings, supra (stating that "even if we were to find that this brief entry was unjustified, there is no evidence to be suppressed as a result. The district court found that the officers did not perform a search of the contents of the trailer or seize any items at that time").
Moreover, another justification for an immediate, warrantless entrance into Doggett's house was the fear that Doggett was destroying evidence. See generally United States v. Scroger,98 F.3d 1256 (10th Cir. 1996) (holding that officers' fear of imminent destruction of evidence may justify a warrantless entry.) Given Chief Wilson's and Trooper Clark's testimony about their observance of Doggett as he attempted to uproot, burn, cut, and otherwise destroy the marijuana plants, Trooper Clark's further testimony that he saw similar packages of marijuana lying on the back porch, near the opened rear door of Doggett's house and his statement that from the air, he saw Doggett run in and out of the house carrying such packages, it would not have been unreasonable for law enforcement to believe that perhaps Doggett was attempting to destroy evidence located inside the house.
In conclusion, none of the conduct undertaken by law enforcement — the aerial *Page 1060 
surveillance, the operation of the helicopters, the entrance onto and inside Doggett's property or his arrest — violated the law.
 III.
Doggett contends that a material misstatement of fact contained in the affidavit used to obtain a warrant to search his house required the suppression of the evidence obtained pursuant to that warrant. Specifically, he argues that the detective who wrote the affidavit to apply for the search warrant included a false statement in that document — that the marijuana had been spotted by a trooper helicopter — and intentionally omitted any reference to guard personnel or equipment.
Section 15-5-3, Ala. Code 1975, requires:
 "A search warrant can only be issued on probable cause, supported by an affidavit naming or describing the person and particularly describing the property and the place to be searched."
In Franklin v. State, 621 So.2d 364 (Ala.Crim.App. 1992),
this Court stated:
 "In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court stated:
 "`The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . concluding" that probable cause existed.'
"462 U.S. at 238, 103 S.Ct. at 2332."
Franklin, 621 So.2d at 368. In Richardson v. State, 376 So.2d 205
(Ala.Crim.App. 1978), we stated:
 "In United States v. Thomas, 489 F.2d 664 (5th Cir. 1973), the Fifth Circuit Court of Appeals adopted the standards to be used in evaluating affidavits which are alleged to contain misrepresentations. Evidence should be suppressed when either of the following occurs:
 "` . . . (1) an intentional misstatement by an affiant-agent, whether material or immaterial to showing probable cause; or (2) a negligent or unreasonable assertion in an affidavit, if material to showing probable cause, but not where (3) the mistake is innocent, even if material to probable cause.'
" . . . .
 " . . . it should be noted that law enforcement officers participating in a common investigation are reliable informants under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), abrogation recognized by White v. State, 550 So.2d 1081 (Ala. 1989)]; Brooks v. United States, 416 F.2d 1044 (1969), Fifth Circuit Court of Appeals; Davis v. State, , 333 So.2d 168 [(Ala.Cr.App. 1976)]."
Richardson, 376 So.2d at 214. In Jones v. State, 719 So.2d 249
(Ala.Crim.App. 1996), this Court stated:
 "A finding of probable cause may be based completely on hearsay evidence, `provided that there is a substantial basis for believing the evidence under the totality of the circumstances.' Rule 3.9(b), Ala.R.Crim.P. `An issuing judge's determination that sufficient probable cause existed to support the warrant "is entitled to great deference and is conclusive in the absence of arbitrariness."' Wamble v. State, 593 So.2d 109, 110 (Ala.Cr.App. 1991), citing United States v. Pike, 523 F.2d 734 (5th Cir. 1975), *Page 1061 
reh'g denied, 525 F.2d 1407, cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976). We must determine whether the issuing judge had a `substantial basis' for concluding that probable cause existed. Wamble v. State; Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)."
Jones v. State, 719 So.2d at 254. (Emphasis added.) "An affidavit need not reflect the direct personal observations of the affiant and may be based on hearsay." Swain v. State, 504 So.2d 347,351 (Ala.Crim.App. 1986), citing Illinois v. Gates, supra. "A trial court's ruling on a motion to suppress will not be overturned unless it is palpably incorrect." State v. Mitchell,722 So.2d 814, 822 (Ala.Crim.App. 1998).
Det. Blackwell testified that he presented an affidavit to Judge Thomas of the Mobile County District Court in order to secure a search warrant to investigate Doggett's house. (R. 76-77.) He stated that in order to gather information for the affidavit, Trooper Clark and Corp. Coone briefed him on what they had seen during their aerial surveillance. (R. 79.) Det. Blackwell testified in the affidavit that he stated that "Alabama State Troopers . . . flying marijuana eradication spotted marijuana plants" at Doggett's address. (R. 78.) He explained in his testimony that his source of information providing the basis of the affidavit was "the State Trooper pilots [who] were there," including Trooper Clark. Det. Blackwell stated that he then verified what the pilots had told him by examining the marijuana and other drug paraphernalia Doggett had attempted to burn in the fire subsequently stomped out by Trooper Clark. He stated that he believed that the information Trooper Clark provided was reliable. (R. 80.) The record shows that the following colloquy occurred:
 "[Appellant's counsel]: When you went to Judge Thomas (to apply for the search warrant), you knew [the National Guard was] involved in this, didn't you?
 "[Det. Blackwell]: I knew they were there. I didn't know which helicopter spotted what. When I got there, as far as radio traffic goes, I don't know which pilot was saying what. I'm not sure — I wasn't sure whether it was the National Guard helicopter or — I assumed it was the state trooper helicopter mainly. Because when I got there, [the state troopers] were there. The [National Guard helicopter] was flying cover for [the state trooper helicopter]. So to my understanding, it was the state trooper. They told me what they observed."
(R. 86.) Det. Blackwell later clarified that although he knew a National Guard helicopter was involved in this particular incident, he did not know who — the Guard or the troopers — radioed in this call. (R. 88-89.) When asked why he concealed the fact in the affidavit that there was a National Guard helicopter involved in this case, Det. Blackwell replied that when he filled out that document, his understanding was that Trooper Clark had spotted the incident because it was Trooper Clark who told him what had been observed from the air. (R. 90-91.) He testified that he was not trying to conceal anything, rather, he was just revealing all the facts he knew to be true and correct at that point in time. Det. Blackwell testified that to his knowledge, no search of Doggett's residence had occurred, nor any property seized, before the execution of the search warrant, which was granted later that day. (R. 81-82.)
Our review of the record indicates that the search warrant, as granted by Judge Thomas and executed by Det. Blackwell, was not fatally defective merely because it did not specify that the National Guard was involved or who, in fact, first observed *Page 1062 
Doggett, his plants, and his conduct. Especially in light of Det. Blackwell's testimony that he did not try to conceal any facts in the affidavit, rather that he only represented the facts as they were known to him at the time, Doggett has failed to show that Det. Blackwell intentionally made any misstatement concerning who was involved in the drug eradication operations. Likewise, Doggett has failed to show that Det. Blackwell made any "negligent or unreasonable assertion" or mistake in the affidavit. SeeThomas, supra. Det. Blackwell was completely justified in reasonably relying on the information provided to him by the state troopers, especially given the fact that Det. Blackwell, himself, then verified their account of the incident by quickly examining what evidence laid within "plain view." See Richardson, supra, quoting Aguilar, supra, Brooks, supra, and Davis, supra; see alsoJones, supra, quoting Ala.R.Crim.P. 3.9(b), and Swain, supra. Because it does not appear that in light of Det. Blackwell's testimony, the judge improperly granted the search warrant, this Court shall not disturb the trial court's decision to deny Doggett's motions to suppress and reconsider to suppress the evidence seized pursuant to that document. See Jones, supra, quoting Wamble, supra, and Mitchell, supra.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
Long, P.J., and McMillan and Cobb, JJ., concur; Baschab, J., concurs in the result.